## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————
                                                      )
SECURITIES AND EXCHANGE COMMISSION  )
100 F Street, N.E.                                    )
Washington, D.C. 20549,                          )
                                   Plaintiff,        )
                                                      )
                    v.                               )          Case No. _____
                                                      )
RPM INTERNATIONAL INC. and              )
EDWARD W. MOORE,                             )
                                                      )
                                   Defendants.     )
———————————————————————————)

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

### SUMMARY OF THE ACTION

1.      This is a disclosure and accounting fraud case arising from the failure of RPM

International Inc. ("RPM") to timely disclose a loss contingency, or record an accrual for, an

investigation by the U.S. Department of Justice (the "DOJ investigation").  A public company

facing a loss contingency, such as a lawsuit or government investigation, is required under

accounting principles and the securities laws to (1) disclose the loss contingency if a material

loss is reasonably possible, and (2) record an accrual for the loss contingency if a material loss is

probable and reasonably estimable.  In connection with the DOJ investigation, RPM faced a

material loss that was probable and reasonably estimable, but RPM failed to disclose the loss

contingency or record an accrual on its books when required to do so.

2.      The DOJ investigation began in 2011 in response to a complaint filed under the

False Claims Act against RPM and its wholly-owned subsidiary, Tremco, Inc. ("Tremco"), and

concerned whether Tremco overcharged the federal government on certain government

contracts.  In 2013, RPM settled the DOJ investigation and the underlying litigation for nearly $61 million.

3.     Defendant Edward W. Moore, RPM's General Counsel and Chief Compliance Officer, oversaw RPM's response to the DOJ investigation, but failed to disclose material facts about the investigation to RPM's Chief Executive Officer, Chief Financial Officer, Audit Committee, and independent auditors (the "Audit Firm").  For example, Moore knew but failed to inform them:  (1) that RPM sent DOJ several analyses estimating that Tremco overcharged the government by at least $11.9 million on the contracts under investigation; (2) that RPM agreed to submit a settlement offer by a specific date to resolve the DOJ investigation; and (3) that, prior to submitting the settlement offer, RPM's overcharge estimates increased substantially to at least $27-28 million.  Additionally, Moore made material misrepresentations to the Audit Firm about the DOJ investigation in connection with the Audit Firm's reviews and audits of RPM's financial statements and SEC filings.

4.     As a result of Moore's misstatements and his failure to disclose key facts regarding the DOJ Investigation, from October 2012 through December 2013 RPM submitted multiple materially false and misleading filings to the SEC.  For example, RPM's SEC filings from October 2012 through January 2013 failed to disclose any information about the DOJ investigation, including any loss contingency or accrual on RPM's financial statements, as required by the governing accounting principles and securities laws.  Those filings also did not disclose any material weakness in RPM's internal controls over financial reporting or its disclosure controls when in fact such weakness existed.

5.     Moreover, even after RPM disclosed the DOJ investigation and recorded an accrual in April 2013, the company's SEC filings continued to be misleading.  For example, RPM's

filings from April to December 2013 indicated that RPM timely disclosed and accrued for the DOJ investigation when in fact disclosure and accrual were required in earlier reporting periods. In addition, those SEC filings still failed to disclose any material weakness in RPM's internal controls over financial reporting or its disclosure controls.

6.      Because of RPM's false and misleading SEC filings, investors were not timely informed that a material loss relating to the DOJ investigation was reasonably possible or probable.  Investors also were not timely notified of a material weakness in RPM's internal control over financial reporting and its disclosure controls.

7.      In August 2014, RPM restated its financial results for three quarters that occurred during the DOJ investigation and filed amended SEC filings for those quarters.  RPM's amended SEC filings – unlike the original filings – disclosed the DOJ investigation and recorded accruals in each quarter showing the company's best estimates of probable losses related to the investigation.  Further, in connection with the restatement, RPM admitted that it made "errors" relating to the "timing of disclosure and accrual" for the DOJ investigation and that the company had a material weakness in its internal control over financial reporting and its disclosure controls. RPM's restatement thus confirmed that the company's original SEC filings referenced above were materially false and misleading.

8.      By engaging in the conduct described herein, RPM violated antifraud, reporting, books and records, and internal controls provisions of the securities laws, including Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]; Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)]; and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

240.13a-11, and 240.13a-13].  Unless restrained and enjoined, RPM will violate those provisions again in the future.

9.     Moore violated antifraud, books and records, and misleading accountant or auditor provisions of the securities laws, including Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)], and Exchange Act Rules 13b2-1 and 13b2-2(a) [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2(a)].  Unless restrained and enjoined, Moore will violate those provisions again in the future.

10.    The SEC therefore seeks a judgment against RPM and Moore providing permanent injunctive relief and ordering RPM and Moore to pay disgorgement with prejudgment interest and civil money penalties.

## JURISDICTION AND VENUE

11.    The SEC brings this action, and this Court has jurisdiction, pursuant to Securities Act Sections 20(b), 20(d), and 22(a) [15 U.S.C. §§ 77t(b), (d), and 77v(a)], and Exchange Act Sections 21(d)(1) and 27 [15 U.S.C. §§ 78u(d)(1) and 78aa].

12.    Defendants directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, transactions, and practices alleged in this Complaint.

13.    Venue is proper in this district pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because Defendants transact business in this district and violations of the securities laws alleged in this Complaint occurred within this district, including the filing of false and misleading documents with the SEC.

## DEFENDANTS

14.   **RPM International Inc.** is a Delaware corporation with its principal place of business in Medina, Ohio.  RPM, through its subsidiaries, manufactures and sells various chemical product lines, including paints, protective coatings, roofing systems, sealants, and adhesives.  One of RPM's wholly-owned subsidiaries is Tremco, a company that provides roofing materials and services.  At all relevant times, RPM's common stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded continuously on the New York Stock Exchange under the ticker symbol "RPM."  RPM's fiscal year runs from June through May.

15.   **Edward W. Moore**, age 59, is a resident of Ohio and a lawyer admitted to the Ohio bar since 1982.  From 1982 to 2006, Moore practiced corporate and securities law at a law firm. From 2007 to the present, Moore has served as RPM's General Counsel and Corporate Secretary. Beginning in 2011, and continuing to the present, Moore also has served as RPM's Chief Compliance Officer.  At all relevant times, Moore was responsible for reviewing RPM's SEC filings and ensuring that the filings complied with applicable laws and regulations.  Additionally, at all relevant times, Moore acted within the course and scope of his employment by RPM.

## FACTS

### A.   The FCA Complaint is Filed Against RPM and Tremco

16.   The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, is a civil fraud statute that allows triple damages and penalties against a party who submits a false claim to the government.  *See* 31 U.S.C. § 3729(a).  The *qui tam* provisions of the FCA allow a plaintiff, known as a "relator," to bring an action in federal court in the name of the government.  *See* 31 U.S.C. § 3730(b).  When a relator files a complaint under the FCA, the complaint is filed under

seal and provided to DOJ so that DOJ may investigate the relator's allegations.  *See id*.  After the investigation, DOJ informs the court whether DOJ will intervene and litigate the case or decline to intervene and allow the relator to litigate the case alone.  *Id*.

17.    In July 2010, a former Tremco employee filed a *qui tam* complaint under the FCA (the "FCA complaint") in federal court against RPM and Tremco.  The FCA complaint alleged that Tremco overcharged the government under certain government contracts by, among other things, failing to provide required price discounts.  The FCA complaint was filed under seal and provided to DOJ so that DOJ could investigate the allegations and decide whether to intervene in the lawsuit.

### B.    The DOJ Investigation Begins

18.    In March 2011, RPM learned of the DOJ investigation when Tremco received a subpoena from the government, requesting documents related to Tremco's government contracts.

19.    As RPM's General Counsel and Chief Compliance Officer, Moore oversaw the response of RPM and Tremco to the DOJ investigation.  Moore also was required to keep RPM's CEO, CFO, and Audit Committee reasonably informed, with timely and accurate information, regarding the status of the DOJ investigation.  Additionally, Moore was responsible for updating the Audit Firm on the status of the DOJ investigation.

20.    Moore was responsible for providing RPM's CEO and CFO with timely and accurate information about the DOJ investigation so that, among other things, the CEO and CFO could evaluate RPM's disclosure and accrual obligations before certifying the accuracy of certain SEC filings, including RPM's quarterly reports on Forms 10-Q, annual reports on Forms 10-K, and the financial information therein.

21.    Soon after learning of the DOJ investigation in March 2011, RPM retained a law

firm ("RPM's counsel") to represent RPM in connection with the DOJ investigation.  From the outset of that engagement, RPM's counsel and RPM understood that, in order to settle an FCA matter, DOJ generally required at least two times the amount of actual damages sustained from the false claims.  RPM's counsel that worked on the DOJ investigation did not act as RPM's securities disclosure counsel for SEC filings; instead, a different law firm served as RPM's disclosure counsel.

22.    At RPM's quarterly Audit Committee meeting on April 5, 2011, which was attended by RPM's CEO and representatives from the Audit Firm, Moore discussed the DOJ investigation.  Once the Audit Firm became aware of the DOJ investigation in April 2011, its auditors asked Moore on at least a quarterly basis whether any new developments had occurred in the DOJ investigation.

### C.    Disclosure and Accrual Provisions Relating to the DOJ Investigation

23.    Once RPM became aware of the DOJ investigation, the company had to ensure that it complied with certain disclosure and accrual provisions of the federal securities laws in connection with the investigation.  For example, Regulation S-X requires that financial statements included with an issuer's SEC filings must comply with Generally Accepted Accounting Principles ("GAAP"), and provides that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading.  *See* 17 C.F.R. §210.4-01.  Accounting Standards Codification ("ASC") 450-20 codifies GAAP regarding "loss contingencies."[1]  A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur.  *See* ASC 450-20-20.  Loss contingencies include, among other things,

---

[1]        The ASC became effective in 2009.  Prior to the ASC, GAAP regarding loss contingencies was set forth in the Statement of Financial Accounting Standards No. 5, which was often referred to as "FAS 5."

(i) actual or possible claims and (ii) pending or threatened litigation.  *See* ASC 450-20-05-10.

Under GAAP, an issuer must disclose a loss contingency if a material loss is reasonably possible,

*see* ASC 450-20-50-3, and an issuer must record an accrual for a loss contingency, as a charge

against income, if a material loss is probable and reasonably estimable, *see* ASC 450-20-25-2.

From at least March 2011 through August 2013, the DOJ investigation represented a loss

contingency.

24.    Additionally, under Item 303 of Regulation S-K ("Item 303"), which addresses

Management's Discussion and Analysis of Financial Condition and Results of Operations

("MD&A") for Forms 10-K and 10-Q, an issuer must describe any known trends or uncertainties

that have had, or that the issuer reasonably expects will have, a material unfavorable impact on

net sales, revenues, or income from continuing operations.  *See* 17 C.F.R. § 229.303.

25.    Moreover, under Exchange Act Rule 12b-20, along with the information expressly

required to be included in an SEC filing, an issuer must also disclose such further material

information as may be necessary to make the required statements, in light of the circumstances,

not misleading.  *See* 17 C.F.R. § 240.12b-20.

### D.    The Audit Firm Suggests that RPM Consider Disclosing the DOJ Investigation, But RPM and Moore Decide Not to Disclose

26.    On June 7, 2012, the Audit Firm sent an e-mail to Moore regarding the Form 10-K

that was scheduled to be filed in July 2012.  The e-mail stated in part:  "As we head into year-

end and start thinking about disclosures, etc. I wanted to pass along the attached, which is a

document with an example disclosure related to . . . government investigations."  The Audit Firm

attached to the e-mail sample language used by another public company to disclose a

government investigation in an SEC filing.

27.    Despite the Audit Firm providing sample disclosure language, RPM and Moore

decided not to disclose the DOJ investigation at that time.

**E.      DOJ Provides a Copy of the FCA Complaint to RPM**

28.     On August 9, 2012, DOJ provided a copy of the FCA complaint, which had been

partially unsealed, to RPM.  Only a small group of RPM personnel, including Moore, reviewed

the FCA complaint.

29.     Moore did not disclose the FCA complaint to the Audit Firm.

**F.      RPM Informs DOJ that Tremco Did Not Comply with the Government
          Contracts Under Investigation, and Produces Estimates of Overcharges**

30.     On September 12, 2012, with Moore's knowledge and authorization, RPM's

counsel met with DOJ to discuss the DOJ investigation.  During that meeting, RPM's counsel

informed DOJ that Tremco had not complied with the pricing terms of its government contracts.

RPM's counsel also discussed with DOJ an analysis prepared by a consultant for RPM and

Tremco, which calculated that Tremco overcharged the government by at least $11 million

during part of the time period under investigation.  Soon after concluding the September 12

meeting with DOJ, RPM's counsel told Moore what transpired during the meeting, including that

the $11 million overcharge analysis was discussed with DOJ.

31.     On or around September 28, 2012, in connection with the Audit Firm's first quarter

review of RPM, the Audit Firm asked Moore about the status of the DOJ investigation.  In

response, Moore falsely told the Audit Firm that "no claim has been asserted" and the matter was

"investigative in nature and not in litigation."  In fact, Moore knew the FCA complaint had been

filed against RPM and Tremco in federal court.

32.     On October 1, 2012, about two weeks after the September 12 meeting with DOJ,

Moore sent a management representation letter to the Audit Firm in connection with the first

quarter review of RPM.  In the letter, Moore stated that, "since June 1, 2012, neither I, nor any of

the lawyers over whom I exercise general legal supervision, have given substantive attention to, or represented the Company in connection with, material loss contingencies" exceeding $1.2 million.  That representation was materially false and misleading because Moore knew that he and RPM's counsel represented RPM in connection with the DOJ investigation, and that RPM's potential loss relating to the DOJ investigation was at least $11 million.

33.    That same evening, on October 1, 2012, with Moore's knowledge and authorization, RPM sent DOJ a written analysis, estimating that Tremco overcharged the government by approximately $11.4 million during part of the time period under investigation. That analysis set forth in writing the information that had been shared orally with DOJ at the meeting on September 12, and did not include any damages multiplier under the FCA. Moreover, as the $11.4 million overcharge estimate related to only part of the time period under investigation and to only one of the contracts under investigation, and additional overcharge analyses were planned or underway, Moore knew or should have known that the total amount by which Tremco overcharged the government likely was greater than $11.4 million.

34.    The next morning, on October 2, 2012, RPM's Audit Committee held its quarterly meeting, which was attended by, among others, the CEO, the CFO, representatives from the Audit Firm, and Moore.  During the meeting, however, Moore failed to disclose the $11.4 million overcharge estimate that had been sent to DOJ.

35.    As of October 2, 2012, the date of the Audit Committee meeting, RPM had not yet submitted its SEC filings for the fiscal first quarter ended August 31, 2012.  Even without considering the effect of any possible multiplier under the FCA, the $11.4 million overcharge estimate sent to DOJ was material because it equaled approximately 30% of RPM's net income for the first quarter.

**G.     RPM's First Quarter SEC Filings Do Not Disclose Any Information or Accrual Relating to the DOJ Investigation**

36.     On October 3, 2012, RPM filed a Form 8-K, signed by Moore, which attached a press release concerning RPM's financial results for the fiscal first quarter ended August 31, 2012.  The next day, October 4, 2012, RPM filed a Form 10-Q for the fiscal first quarter.

37.     By the dates of those SEC filings on October 3 and 4, 2012, Moore knew or should have known it was not only reasonably possible, but probable and reasonably estimable, that RPM would incur a material loss in connection with the DOJ investigation.  Similarly, by the dates of those SEC filings, Moore knew it was reasonably likely that the DOJ investigation would have a material unfavorable impact on RPM's income in the future because the likely floor for RPM's range of loss was at least $11.4 million, even before considering the impact of any damages multiplier under the FCA.

38.     Nevertheless, despite the disclosure duties imposed by ASC 450-20 (requiring the disclosure of a material loss contingency or accrual), Item 303 (requiring the disclosure of a trend or uncertainty reasonably expected to have a material unfavorable impact), and Rule 12b-20 (requiring the disclosure of additional material information needed to make the statements in an SEC filing not misleading), neither the Form 8-K nor the Form 10-Q disclosed any information or accrual relating to the DOJ investigation.

39.     RPM's Form 8-K filed October 3, 2012 purported to provide the company's financial results for its fiscal first quarter but misleadingly failed to disclose the material impact of the DOJ investigation on those results.  As shown by RPM's subsequent restatement, contrary to the originally reported first quarter results, RPM was required to record an accrual for the DOJ investigation as a charge against income in its first quarter.

40.     Although RPM's Form 10-Q filed October 4, 2012 discussed "contingencies" in the

notes to the company's financial statements and in the MD&A section, RPM omitted any information about the DOJ investigation, which was necessary to make the discussion regarding contingencies not misleading.  RPM's Form 10-Q also stated that, "We are party to various claims and lawsuits" and "we record provisions when we consider the liability probable and reasonably estimable," but misleadingly failed to disclose that in fact a material loss relating to the DOJ investigation was probable and reasonably estimable by October 4, 2012, when the Form 10-Q was filed.

41.   Additionally, RPM's Form 10-Q falsely and misleadingly stated that, as of the end of RPM's first quarter, "our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act (1) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and (2) is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow for timely decisions regarding required disclosure."  In fact, as RPM later admitted in connection with its restatement, its disclosure controls and procedures were not effective at the end of the first quarter.

42.   On October 19, 2012, about two weeks after RPM's first quarter SEC filings, RPM filed with the SEC a Prospectus Supplement for a $300 million notes offering.  Moore oversaw the notes offering and reviewed the Prospectus Supplement before it was filed with the SEC. The Prospectus Supplement stated to investors that "[i]t is important for you to read and consider all information . . . incorporated by reference in this prospectus supplement . . . in making your investment decision."  The Prospectus Supplement incorporated by reference RPM's SEC filings, including the materially misleading first quarter Form 10-Q filed on October 4, 2012.

RPM's sale of the notes closed on or around October 23, 2012.

### H.   Moore's Awareness of Negative Repercussions from Disclosing the DOJ Investigation or Recording an Accrual

43.    Around the time of RPM's first quarter SEC filings in October 2012, Moore was aware of pressure to avoid, or at least postpone, recording another one-time charge on RPM's books.  In RPM's Form 8-K filed on October 3, 2012, which related to RPM's first quarter results, the company disclosed two one-time charges that were unrelated to the DOJ investigation:  a $45 million charge for certain work in India, and another $11 million charge for other work overseas.  According to the Chairman of RPM's Audit Committee, at the Audit Committee meeting on October 2, 2012, the Committee communicated that "we're not going to be accepting of ongoing extraordinary charges or one-time charges.  We didn't think that that would bode well for the company and . . . the impression of our shareholders and others of how we run the business, and we made that clear."  Similarly, at RPM's annual shareholder meeting on October 4, 2012, RPM's CEO told the shareholders that RPM would not "water torture them" with additional one-time "charges quarter after quarter."

44.    Moore also was aware that disclosing the DOJ investigation or recording an accrual could negatively affect RPM's stock price.  According to Moore, disclosing the DOJ investigation in RPM's first quarter SEC filings could have caused "uncertainty" and "depress[ed] the value of the stock."  Moore had a personal interest in RPM's stock price because, as of August 31, 2012, he owned 65,952 shares of RPM stock – worth more than $1.8 million – plus 65,000 RPM stock options.

45.    In addition, Moore was aware that disclosing the DOJ investigation might cause reputational harm to RPM and Tremco.  According to Moore, disclosing the DOJ investigation in RPM's first quarter SEC filings could have caused "harm to [RPM's] roofing business."  Further,

according to Moore, if the FCA complaint "became public and everybody read about these really scandalous allegations," that could "really damage [Tremco's] business, possibly irreparably."

### I. DOJ Conveys a Deadline for Intervention in the FCA Case, and RPM Says It Will Submit a Settlement Offer

46. On November 5, 2012, DOJ notified RPM by e-mail that the seal on the FCA complaint would expire on January 17, 2013, and thus DOJ "want[ed] to make sure that the parties are in an appropriate posture by that date (i.e., this matter is resolved or the United States is prepared to inform the Court of its intervention determination)." RPM's counsel conveyed DOJ's message to Moore.

47. On November 29, 2012, Moore attended a seminar regarding the FCA. According to Moore, during that seminar it was discussed that DOJ typically seeks to settle FCA cases for at least two times the amount of damages sustained from the false claims.

48. On December 14, 2012, with Moore's knowledge and authorization, RPM sent DOJ another analysis, calculating that Tremco overcharged the government by an additional $487,000 on its government contracts. Therefore, by December 14, 2012, Moore knew that Tremco had overcharged the government by at least $11.9 million, and that RPM was working on additional overcharge calculations, so the total overcharge amount likely would continue to rise.

49. On December 19, 2012, with Moore's knowledge and authorization, RPM informed DOJ that RPM would submit a settlement offer to resolve the DOJ investigation and the underlying FCA case by January 11, 2013. No later than December 19, 2012, with Moore's knowledge and authorization, RPM's counsel began preparing a written settlement offer.

50. Two days later, on December 21, 2012, RPM's counsel and certain RPM personnel, including Moore, held a conference call to discuss the DOJ investigation and RPM's planned settlement offer. During the call, the participants discussed the components of the planned

14

settlement offer and those components totaled $27-28 million.  That figure represented the

amount that RPM calculated Tremco had overcharged the government on the contracts under

investigation, without considering any damages multiplier under the FCA.

51.    One week later, on December 28, 2012, Moore sent another management

representation letter to the Audit Firm in connection with the second quarter review of RPM.  In

the letter, Moore stated that, "since June 1, 2012, neither I, nor any of the lawyers over whom I

exercise general legal supervision, have given substantive attention to, or represented the

Company in connection with, material loss contingencies" exceeding $1.2 million.  That

representation was materially false and misleading because Moore knew that he and RPM's

counsel represented RPM in connection with the DOJ investigation; that RPM was planning to

submit a settlement offer to resolve the DOJ investigation by January 11, 2013; and that

estimates for the settlement offer were approximately $27-28 million.

52.    Also on or around December 28, 2012, as part of the second quarter review of

RPM, the Audit Firm again asked Moore about the status of the DOJ investigation.  During that

conversation, Moore falsely stated that "no claim has been filed" and "no loss contingency

exists."  Contrary to that statement, however, Moore knew the FCA complaint had been filed

against RPM and he knew about the DOJ investigation.

53.    On January 4, 2013, four days before RPM was scheduled to file its Form 10-Q for

the fiscal second quarter, RPM's Audit Committee held its quarterly meeting.  That meeting was

attended by, among others, RPM's CEO, CFO, the Chairman of the Audit Committee,

representatives from the Audit Firm, and Moore.  During the meeting, Moore purported to

provide an update on the current status of the DOJ investigation.  But Moore's update was

materially inaccurate because he did not disclose:  (1) any of the overcharge estimates that had

been sent to DOJ, which by this time totaled nearly $12 million; (2) that RPM had told DOJ a settlement offer would be submitted by January 11, 2013; or (3) that calculations for the settlement offer had reached $27-28 million.  Indeed, Moore did not disclose that information to RPM's CEO, CFO, the Chairman of the Audit Committee, or the Audit Firm at any time prior to RPM's second quarter SEC filings on January 8, 2013.  Additionally, prior to January 8, 2013, Moore did not disclose the underlying FCA complaint to the Audit Firm.

> **J.     RPM's Second Quarter SEC Filings Do Not Disclose Any Information or Accrual Relating to the DOJ Investigation**

54.     On January 8, 2013, RPM filed a Form 8-K, signed by Moore, which attached a press release concerning RPM's financial results for the fiscal second quarter ended November 30, 2012.  That same day, RPM also filed a Form 10-Q for the fiscal second quarter.

55.     By the date of those SEC filings on January 8, 2013, Moore knew or should have known it was not only reasonably possible, but probable and reasonably estimable, that RPM would incur a material loss in connection with the DOJ investigation.  Similarly, by January 8, Moore knew it was reasonably likely that the DOJ investigation would have a material unfavorable impact on RPM's income in the future because the likely floor for RPM's range of loss was at least $27-28 million, even before considering the impact of a damages multiplier under the FCA.

56.     But again, in violation of the disclosure duties imposed by ASC 450-20, Item 303, and Rule 12b-20, neither RPM's Form 8-K nor its Form 10-Q disclosed any information or accrual relating to the DOJ investigation.

57.     RPM's Form 8-K filed January 8, 2013 purported to provide the company's financial results for its fiscal second quarter but misleadingly failed to disclose the material impact of the DOJ investigation on those results.  As shown by RPM's subsequent restatement,

contrary to the originally reported second quarter results, RPM was required to record an accrual for the DOJ investigation as a charge against income in its second quarter.

58.    RPM's Form 10-Q filed January 8, 2013 again discussed "contingencies" in the notes to RPM's financial statements and in the MD&A section but omitted any information about the DOJ investigation, which was necessary to make the statements made regarding contingencies not misleading.  Also, the Form 10-Q again stated that RPM records accruals for claims and lawsuits "when we consider the liability probable and reasonably estimable," but misleadingly failed to mention that in fact a material loss relating to the DOJ investigation was probable and reasonably estimable by January 8, 2013, when the Form 10-Q was filed.

59.    Additionally, RPM's Form 10-Q falsely and misleadingly stated that, as of the end of RPM's second quarter, the company's "disclosure controls and procedures were effective." But, as RPM later admitted in connection with its restatement, its disclosure controls and procedures were not effective at the end of the second quarter.

60.    As of January 8, 2013, when RPM's second quarter Form 10-Q was filed with the SEC, Moore had only told the Audit Firm that the range of loss for the DOJ investigation was approximately $5 million.  That representation was materially false and misleading because Moore knew that RPM had submitted overcharge estimates to DOJ totaling nearly $12 million (without considering any damages multiplier under the FCA), and that RPM was planning to submit a settlement offer of approximately $27-28 million in a matter of days.

### K.    RPM Submits a Settlement Offer to DOJ and Records an Accrual

61.    On January 10, 2013, two days after RPM's second quarter Form 10-Q was filed with the SEC, Moore told RPM's CEO for the first time that the potential range of loss for the DOJ investigation had grown from $5 million to $28 million.  Upon learning that information,

the CEO was surprised and angry and asked Moore, "How the hell could this happen?" According to the CEO, it was "impossible" for the range of loss to have grown so significantly between January 8 and 10, 2013.

62.    The next day, January 11, 2013, RPM submitted a 44-page settlement proposal to DOJ, offering to settle the DOJ investigation and the underlying FCA case for $28.3 million – the amount that RPM estimated Tremco overcharged the government without any damages multiplier under the FCA.

63.    RPM's CFO did not learn that the company made a settlement offer of $28.3 million until eleven days later, at a Board of Directors meeting on January 22, 2013.  The CFO was shocked to learn that RPM's offer, and its financial exposure in the DOJ investigation, were so high.  The CFO did not know the true amount or range of RPM's reasonably possible or probable loss in the DOJ investigation prior to that Board meeting because Moore failed to inform him of material developments in the investigation.

64.    On March 29, 2013, DOJ conveyed a settlement counter-offer of $71 million, which included a damages multiplier of approximately 2.5 under the FCA.  On April 1, 2013, RPM for the first time recorded an accrual for the DOJ investigation, in the amount of $68.8 million, which was reflected on the company's books as of the fiscal third quarter.

**L.      RPM Discloses the DOJ Investigation and Accrual**

65.    On April 4, 2013, RPM filed a Form 8-K, signed by Moore, which attached a press release concerning RPM's financial results for the fiscal third quarter ended February 28, 2013, and publicly disclosed for the first time the DOJ investigation and related accrual.  Later that day, RPM filed a Form 10-Q for its third quarter that also discussed the DOJ investigation and accrual.  The Form 10-Q reported a net loss by RPM of $42.2 million for the third quarter,

compared to net income of $7.9 million for the same quarter one year earlier.  According to the 10-Q, the "primary driver of the decline" was the $68.8 million accrual for the DOJ investigation.  Both the Forms 8-K and 10-Q misleadingly indicated that RPM had timely disclosed and accrued for the DOJ investigation in the fiscal third quarter, when in fact disclosure and accrual were required in the first and second quarters, as indicated by RPM's subsequent restatement.

66.    As of April 4, 2013, when RPM publicly disclosed the DOJ investigation, the underlying FCA complaint remained under seal.  Thus, the fact that the complaint was sealed did not prevent RPM from disclosing the DOJ investigation in an SEC filing.

### M.    Moore Makes Further Misrepresentations to the Audit Firm About the DOJ Investigation

67.    On June 10, 2013, in connection with RPM's fiscal year audit and the preparation of its Form 10-K, the Audit Firm met with Moore and asked about the timing of RPM's accrual for the DOJ investigation.  During the meeting, Moore stated that, after RPM's Form 10-Q was filed on January 8, 2013, RPM completed additional pricing calculations for certain years under investigation and the government threatened to unseal the FCA complaint, and therefore RPM decided to make a settlement offer of $28 million on January 11, 2013.

68.    Moore's June 10, 2013 statements to the Audit Firm were materially false and misleading because on December 19, 2012 – weeks before RPM's Form 10-Q was filed on January 8, 2013 – RPM told DOJ a settlement offer would be submitted by January 11, 2013. Further, Moore's June 10, 2013 statements to the Audit Firm were misleading because Moore still did not disclose the overcharge estimates that RPM had sent to DOJ prior to submitting the settlement offer or that RPM's estimates of the contractual overcharges had grown to $27-28 million by the time RPM's second quarter Form 10-Q was filed on January 8, 2013.

N.     **RPM's Form 10-K Discusses the DOJ Investigation, But Fails to Disclose Any Material Weakness in RPM's Controls and Misleadingly Indicates that RPM Timely Disclosed and Accrued for the DOJ Investigation**

69.    On July 24, 2013, RPM filed its Form 10-K for the fiscal year ended May 31, 2013. The Form 10-K discussed the DOJ investigation and the related accrual that RPM recorded in its third quarter ended February 28, 2013. The Form 10-K, however, misleadingly indicated that RPM timely disclosed and accrued for the DOJ investigation in the third quarter, when in fact disclosure and accrual were required in the first two quarters. Additionally, the Form 10-K misleadingly failed to disclose any material weakness in RPM's internal control over financial reporting at any point during the fiscal year, when in fact such weakness existed. Instead, the Form 10-K misleadingly stated that RPM's internal controls were effective.

70.    In July 2013, RPM paid Moore a cash bonus of $300,000 for the fiscal year ended May 31, 2013. That bonus was based in part on RPM's financial performance during the fiscal year, including the company's net income, which was bolstered by the October 2012 notes offering.

71.    In August 2013, RPM settled the DOJ investigation and the underlying FCA case for approximately $61 million. DOJ issued a press release announcing the settlement on August 28, 2013.

72.    On December 5, 2013, RPM filed with the SEC a Prospectus Supplement for a $200 million notes offering. The underwriters exercised an option to purchase additional notes, bringing the total amount of the offering to $205 million. Moore oversaw the notes offering and reviewed the Prospectus Supplement before it was filed with the SEC. The Prospectus Supplement incorporated by reference RPM's SEC filings, including the materially misleading Form 10-K filed on July 24, 2013, and stated that it was "important" for investors to consider this information. RPM's sale of the notes closed on or around December 9, 2013.

**O.      The Audit Firm Learns New Facts About the DOJ Investigation**

73.     On March 31, 2014, RPM sent the SEC staff a written chronology of events related to the DOJ investigation.  Moore reviewed and authorized the chronology before it was sent to the SEC.

74.     The chronology discussed RPM's communications with DOJ in 2012 and 2013. Among other things, the chronology stated that, "[o]n December 19, 2012, RPM and Tremco informed the DOJ that a settlement proposal would be submitted by January 11, 2013."

75.     On April 5, 2014, the Audit Firm received a copy of RPM's chronology and learned for the first time that, on December 19, 2012, RPM told DOJ a settlement offer would be submitted by January 11, 2013.  Upon learning that new information, the Audit Firm was concerned.  Shortly after reviewing RPM's chronology, on April 5, 2014, the Audit Firm sent an e-mail to Moore and RPM's CFO, stating in part:  "We had an Audit Committee meeting on January 4, 2013 and the November 30, 2012 10-Q was filed January 8 I believe.  At this time, we were told the whole matter was still a $5 million issue."

**P.      The Audit Firm Asks Additional Questions About the DOJ Investigation, and Moore Makes Additional Misrepresentations**

76.     On April 8, 2014, members of the Audit Firm met with Moore and RPM's CFO to discuss the chronology that RPM submitted to the SEC and a Form S-3 registration statement for which RPM needed the Audit Firm's consent before filing with the SEC.  During the meeting, Moore told the Audit Firm that:  (1) on December 19, 2012, the range of reasonably possible loss for the DOJ investigation was $0 to $10 million; (2) the range of reasonably possible loss continued to be $0 to $10 million through January 8, 2013, when RPM's second quarter Form 10-Q was filed; and (3) the range of loss went from $0 to $10 million up to $28 million, and became probable, between January 8 and 11, 2013.

77.    Moore's April 8, 2014 statements to the Audit Firm were materially false and misleading because Moore knew that:  (1) by December 19, 2012, the overcharge estimates RPM had sent to DOJ totaled nearly $12 million without any damages multiplier under the FCA; (2) by January 8, 2013, RPM's calculations for its settlement offer had reached $27-28 million; and (3) RPM's range of reasonably possible or probable loss had reached $27-28 million by December 21, 2012 – it did not jump to that amount between January 8 and 11, 2013.  Based on Moore's misrepresentations, the Audit Firm provided its consent for the Form S-3, which RPM filed with the SEC.

78.    In July 2014, RPM paid Moore a cash bonus of $400,000 for the fiscal year ended May 31, 2014.  That bonus was based in part on RPM's financial performance during the fiscal year, including the company's net income, which was bolstered by the December 2013 notes offering.

**Q.     RPM Restates its Financial Statements**

79.    During the summer of 2014, the Audit Firm learned additional facts about the DOJ investigation, including the overcharge estimates that RPM sent to DOJ in 2012.  As a result of that new information, on or around July 17, 2014, the Audit Firm told RPM that the Audit Firm would not sign off on RPM's Form 10-K for the fiscal year ended May 31, 2014, unless RPM conducted an independent investigation regarding its disclosure and accrual for the DOJ investigation.  In response, RPM's Audit Committee hired a law firm to conduct an investigation (the "Audit Committee investigation").  The Audit Committee investigation took place from late July through early August 2014.

80.    On August 10, 2014, the findings of the Audit Committee investigation were shared with the Audit Firm in a conference call.  Those findings included, among other things, that by

the end of the third week of December 2012, it became "known to Ed Moore" that RPM's

financial exposure in the DOJ investigation was "going to jump" from around $11 million to

around $28 million; that RPM's securities "[d]isclosure counsel [was] not aware" of the

overcharge estimates sent to DOJ; and that Moore made "mistakes," including "no disclosure to

[the Audit Firm] or audit committee" at the Audit Committee meeting on January 4, 2013.

81.    The next day, August 11, 2014, the Audit Committee directed RPM to restate the

first, second, and third quarters of fiscal year 2013.  RPM determined that its restated financial

statements would reflect an $11.4 million accrual for the DOJ investigation in the first quarter

(which corresponded to the $11.4 million estimate sent to DOJ on October 1, 2012), and an

additional $16.9 million accrual for the investigation in the second quarter (for a total accrual of

$28.3 million, which corresponded to RPM's settlement offer to DOJ on January 11, 2013).

RPM also restated its third quarter to reduce the accrual in that quarter from $68.8 million to

$40.5 million, since $28.3 million was accrued in the restated first and second quarters.

82.    On August 14, 2014, RPM filed a Form 8-K, signed by Moore, to announce the

restatement.  The Form 8-K stated that RPM made "errors" in disclosing and accruing for the

DOJ investigation.  The restatement was necessary because RPM's disclosure and accounting

errors were material.  Moreover, RPM's Form 8-K also disclosed that "the restatement reflects a

material weakness in the Company's internal control over financial reporting and that its

disclosure controls and procedures were not effective" as of the first and second fiscal quarters

ended on August 31 and November 30, 2012.

83.    Also on August 14, 2014, RPM filed amended Forms 10-Q for the first quarter

ended August 31, 2012, and the second quarter ended November 30, 2012.  The amended Forms

10-Q, unlike the originals, disclosed the DOJ investigation and reflected accruals showing

RPM's "best estimate of the amount of probable loss" associated with the DOJ investigation.

84.    RPM's restatement and amended SEC filings thus confirmed that RPM's original SEC filings in 2012 and 2013, referenced above, were materially inaccurate.  By filing amended Forms 10-Q that disclosed the DOJ investigation and related accruals, RPM essentially admitted not only that a material loss was reasonably possible by October 4, 2012 and January 8, 2013, when the original Forms 10-Q were filed, but also that a material loss was probable and estimable by those dates.

### FIRST CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)(2)**
**(Against RPM and Moore)**

85.    All of the foregoing paragraphs are incorporated by reference herein.

86.    By the conduct alleged herein, RPM and Moore, in the offer or sale of RPM securities, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, and acting at least negligently, obtained money or property by means of untrue statements of material fact and material omissions.

87.    By reason of the foregoing, RPM and Moore violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### SECOND CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)(3)**
**(Against RPM and Moore)**

88.    All of the foregoing paragraphs are incorporated by reference herein.

89.    By the conduct alleged herein, RPM and Moore, in the offer or sale of RPM securities, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, and acting at least negligently, engaged in transactions, practices, or courses of business that operated or would operate as a fraud or

deceit upon the purchaser of the securities.

90.    By reason of the foregoing, RPM and Moore violated Section 17(a)(3) of the

Securities Act [15 U.S.C. § 77q(a)(3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 13(a) and**
**Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13**
**(Against RPM)**

91.    All of the foregoing paragraphs are incorporated by reference herein.

92.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11,

and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of

registered securities to file with the SEC factually accurate annual reports (on Form 10-K),

quarterly reports (on Form 10-Q), and current reports (on Form 8-K).  Exchange Act Rule 12b-

20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be

included in a statement or report, there shall be added such further material information, if any,

as may be necessary to make the required statements, in light of the circumstances under which

they were made, not misleading.

93.    By reason of the foregoing, RPM violated Section 13(a) of the Exchange Act and

Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

**FOURTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 13(b)(2)(A)**
**(Against RPM)**

94.    All of the foregoing paragraphs are incorporated by reference herein.

95.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires

issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately

and fairly reflect the transactions of the company and dispositions of its assets.

96.    By reason of the foregoing, RPM violated Section 13(b)(2)(A) of the Exchange Act.

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(2)(B)
### (Against RPM)

97.   All of the foregoing paragraphs are incorporated by reference herein.

98.   Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

99.   By reason of the foregoing, RPM violated Section 13(b)(2)(B) of the Exchange Act.

## SIXTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-1
### (Against Moore)

100.  All of the foregoing paragraphs are incorporated by reference herein.

101.  Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1] provides that no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Exchange Act.

102.  By reason of the foregoing, Moore violated Rule 13b2-1 under the Exchange Act.

## SEVENTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-2(a)
### (Against Moore)

103.  All of the foregoing paragraphs are incorporated by reference herein.

104.  Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] provides that no director or officer of an issuer shall, directly or indirectly, make or cause to be made a materially false or misleading statement to an accountant or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with any audit, review, or

examination of the financial statements of the issuer or the preparation or filing of any document or report required to be filed with the SEC.

105.  By reason of the foregoing, Moore violated Rule 13b2-2(a) under the Exchange Act.

## PRAYER FOR RELIEF

Accordingly, the SEC respectfully requests that the Court enter a final judgment:

A.      Permanently enjoining RPM from further violations of Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]; Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)]; and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13];

B.      Permanently enjoining Moore from further violations of Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)], and Exchange Act Rules 13b2-1 and 13b2-2(a) [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2(a)];

C.      Ordering RPM and Moore to disgorge their ill-gotten gains as a result of the conduct alleged in this Complaint, plus prejudgment interest thereon;

D.      Ordering RPM and Moore to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E.      Granting such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the SEC demands a trial by jury on all issues so triable.


Of Counsel:                                                 Respectfully submitted,

Antonia Chion                                               /s/ Timothy K. Halloran
Cheryl L. Crumpton                                          H. Michael Semler (DC Bar No. 162479)
Stacy L. Bogert                                                 Tel: 202-551-4429
                                                                E-mail: semlerm@sec.gov
                                                            Gregory R. Bockin (DC Bar No. 450885)
                                                                Tel: 202-551-5684
                                                                E-mail: bocking@sec.gov
                                                            Timothy K. Halloran (DC Bar No. 483245)
                                                                Tel: 202-551-4414
                                                                E-mail: hallorant@sec.gov
                                                            Securities and Exchange Commission
                                                            100 F Street, NE
                                                            Washington, DC 20549

Dated:  September 9, 2016