## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
 )
SECURITIES AND EXCHANGE )
COMMISSION, )
 )
Plaintiff, )
 )
v. ) Civil Action No. 16-1803 (ABJ)
 )
RPM INTERNATIONAL, INC., *et al.*, )
 )
Defendants. )
_____)

## MEMORANDUM OPINION

The Securities and Exchange Commission ("SEC") has brought this action alleging securities violations under the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Exchange Act Rules, against defendants RPM International, Inc. ("RPM") and RPM's General Counsel and Chief Compliance Officer, Edward W. Moore ("Moore"). Compl. [Dkt. # 1] ¶¶ 1, 3 8–9, 85–105. The SEC alleges that defendants fraudulently failed to disclose loss contingencies in RPM's SEC filings at a time when they were aware that a *qui tam* action had been filed against RPM under the False Claims Act, and that the Department of Justice was conducting an investigation to determine whether it would intervene, and even after settlement negotiations between RPM and DOJ were underway. *Id.* ¶¶ 1–2, 17. The SEC seeks to enjoin RPM and Moore from committing further violations of the securities laws, to disgorge their ill-gotten gains, and to pay civil money penalties. *Id.* at 27.

On February 17, 2017, RPM filed a motion to dismiss the claims against it pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Notice of Def. RPM International Inc.'s Mot. to Dismiss [Dkt. # 30] ("RPM Mot."). It argues that the SEC failed to state a claim that the

company's financial statements were "false" because accounting rules do not "require a company to disclose preliminary settlement offers and because the [c]omplaint does not allege that RPM did not subjectively believe in its accounting treatment."  Mem. of P. & A. in Supp. of RPM Mot. [Dkt. # 30] ("RPM Mem.") at 2, 4.  RPM also contends that Claims 1, 2, and 3 should be dismissed for the independent reason that the complaint fails to plausibly allege that the alleged misstatements were material, and it maintains that Claims 1 and 2 should be dismissed with respect to statements made after October 2012 because the SEC has failed to allege the facts necessary to prove that RPM violated Section 17(a) of the Securities Act.  *Id.* at 4.

Defendant Moore has also filed a motion to dismiss the claims against him pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  Def. Edward W. Moore's Mot. to Dismiss [Dkt. # 31] ("Moore Mot."); Mem. of P. & A. in Supp. of Moore Mot. [Dkt. # 31-1] ("Moore Mem.") at 1.  Moore argues that the facts in the complaint "fail to establish that the relevant accounting rules required accrual for or disclosure of potential loss associated with the government investigation prior to the date on which RPM did accrue and disclose it," and that, with regard to Claim 1, the SEC has failed to adequately plead that Moore "obtained money or property as a result of RPM's alleged failure to accrue or disclose earlier than it did."  Moore Mem. at 2–3.

The SEC opposed both motions in a consolidated brief on March 24, 2017, SEC's Opp. to Defs.' Mots. to Dismiss [Dkt. # 33] ("Pl.'s Opp."), and RPM and Moore each filed a separate reply on April 13, 2017.  Reply Mem. of P. & A. in Supp. of RPM Mot. [Dkt. # 34] ("RPM Reply"); Reply Mem. of P. & A. in Supp. of Moore Mot. [Dkt. # 35] ("Moore Reply").  Viewing the facts in the light most favorable to the SEC, as it is required to do at this stage, the Court finds that the SEC has alleged sufficient facts, with the necessary particularity, to state plausible fraud claims against RPM and Moore, and the case will proceed.

## BACKGROUND

RPM is a Delaware corporation headquartered in Medina, Ohio that "manufactures and sells various chemical product lines, including paints, protective coatings, roofing systems, sealants, and adhesives." Compl. ¶ 14. In 2007, Moore began serving as RPM's General Counsel and Corporate Secretary, and in 2011, he assumed the additional position of Chief Compliance Officer. *Id.* ¶ 15.

The instant action stems from a previous lawsuit against RPM and one of its wholly-owned subsidiaries, Tremco, Inc. ("Tremco"), a company that "provides roofing materials and services." Compl. ¶¶ 1–2, 14. In July 2010, a former Tremco employee filed a *qui tam* complaint under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), alleging that Tremco overcharged the United States under several government contracts by failing to provide required price discounts. *Id.* ¶¶ 3, 17. DOJ initiated an investigation into the complaint's allegations in order to decide whether to intervene in the lawsuit. *Id.* ¶ 17.

RPM learned of the DOJ investigation in March 2011 when it received a subpoena seeking documents regarding RPM's and Tremco's government contracts. Compl. ¶ 18. Moore oversaw the responses of both RPM and Tremco to the DOJ investigation, and he kept RPM senior officials and auditors informed. *Id.* ¶¶ 2, 17–20. RPM also retained outside counsel to represent it in connection with the DOJ investigation. *Id.* ¶ 21.

Moore discussed the DOJ investigation at RPM's quarterly Audit Committee meeting on April 5, 2011, and according to the complaint, RPM's outside audit firm asked Moore each quarter to keep it apprised of any new developments in the investigation. Compl. ¶ 22.

## I.     First Quarter Fiscal Year 2013 (June–August 2012)

On June 7, 2012, the audit firm sent an e-mail to Moore regarding the Form 10-K that was scheduled to be filed with the SEC in July, suggesting disclosure language related to government investigations.  Compl. ¶ 26.  However, RPM and Moore did not disclose the DOJ investigation in its SEC filing in July.  *Id.* ¶ 27.

On August 9, 2012, DOJ provided RPM with a copy of the *qui tam* complaint, which the court had partially unsealed so that the government could disclose the existence of the lawsuit to RPM and Tremco.  Compl. ¶ 28; *see* Decl. of William H. Wagener [Dkt. # 30-1] ("Wagener Decl.");  Ex. A to Wagener Decl. [Dkt. # 30-2].[1]  After learning of the complaint, Moore did not disclose it to RPM's audit firm.  Compl. ¶ 29.

## II.    Second Quarter Fiscal Year 2013 (September–November 2012)

On September 12, 2012, RPM's outside counsel met with DOJ and discussed an analysis prepared by a consultant that calculated that Tremco had overcharged the government by at least $11 million during part of the time period under investigation.  Compl. ¶ 30.  The SEC claims that RPM's outside counsel informed Moore of what transpired during the meeting, including telling him about the $11 million overcharge discussion.  *Id.*  On approximately September 28, 2012, while RPM's audit firm was conducting the company's first quarter review, it asked Moore about

---

1     The Court may consider any documents attached to or incorporated by reference in the complaint.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  This includes any documents upon which the complaint necessarily relies, even if the document is produced by the defendant in a motion to dismiss.  *Hinton v. Corrs. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009), citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).  The SEC does not seem to challenge that defendants have provided the Court with additional documents, seeing as the agency actually cites to some of these documents in its opposition.  *See* Pl.'s Opp. at 6 n.9 (citing to Ex. H. to Wagener Decl.).

the status of the DOJ investigation. *Id.* ¶ 31. Moore told the firm that "'no claim has been asserted' and that the matter was 'investigative in nature and not in litigation.'" *Id.*

Moore sent a management representation letter to the audit firm on October 1, 2012, in connection with the first quarter review, stating that, "'since June 1, 2012, neither [he], nor any of the lawyers over whom [he] exercise[s] general legal supervision, have given substantive attention to, or represented the [c]ompany in connection with, material loss contingencies' exceeding $1.2 million." Compl. ¶ 32; *see* Ex. H. to Wagener Decl. [Dkt. # 30-9] ("Ex. H").[2] That same day, RPM sent DOJ a written analysis, estimating that Tremco overcharged the government by approximately $11.4 million during part of the time period under investigation. Compl. ¶ 33. The following morning, RPM's Audit Committee held its quarterly meeting, but Moore did not disclose the $11.4 million overcharge estimate that had been sent to DOJ. *Id.* ¶ 34. At the same meeting, the Chairman of the Audit Committee allegedly said that the company was "not going to be accepting of ongoing extraordinary charges or one-time charges" against income because "that would [not] bode well for the company and [] the impression of our shareholders and others of how we run the business." *Id.* ¶ 43. Further, according to the complaint, the $11.4 million

---

2      The letter reads:

> I advise you that since June 1, 2012, neither I, nor any of the lawyers over whom I exercise general legal supervision, have given substantive attention to, or represented the Company in connection with, material loss contingencies [of $1.2 million] . . ., except for the matters described in the audit response letters of the law firms listed in Exhibit A."

Ex. H. The relevant law firm audit response letter provides similar information. Exhibit A to the letter lists RPM's outside counsel, and it identifies the "Tremco Roofing Matters." *Id.* The law firm's audit response letter then states that it has "not been engaged to give substantive attention to, or represent the [c]ompany in connection with, loss contingencies involving in excess of $1,200,000 individually or in the aggregate." Ex. J to Wagener Decl. [Dkt. # 30-11]. The law firm also states that it does "not consider investigations by government or self-regulatory authorities to fall within the definition of 'loss contingency.'" *Id.*

overcharge estimate equaled approximately 30% of RPM's net income for the first quarter. *Id.* ¶ 35.

RPM filed a Form 8-K, signed by Moore, on October 3, 2012, and it filed a Form 10-Q for the first quarter the next day. Compl. ¶ 36. The Form 8-K made no mention of any loss contingency, but the Form 10-Q discussed "contingencies" in the broad sense that RPM is a "party to various claims and lawsuits." *Id.* ¶¶ 39–40. But RPM did not disclose any information about the DOJ investigation specifically in either filing. *Id.* ¶ 40. The SEC also alleges that the Form 10-Q "falsely and misleadingly stated that, as of the end of RPM's first quarter, '[RPM's] disclosure controls and procedures were effective.'" *Id.* ¶ 41.

On October 19, 2012, RPM filed a Prospectus Supplement with the SEC for a $300 million notes offering. Compl. ¶ 42. The Prospectus Supplement incorporated by reference RPM's SEC filings, including the Form 8-K and 10-Q that were filed a few days earlier. *Id.* Moore oversaw the notes offering, which closed on approximately October 23, 2012. *Id.*

### III. Third Quarter Fiscal Year 2013 (December 2012–February 2013)

On November 5, 2012, DOJ notified RPM that the seal on the *qui tam* complaint was set to expire on January 17, 2013, and that the DOJ wanted to resolve the matter by that date or be in a position to inform the court of its intervention determination. Compl. ¶ 46. On December 14, 2012, RPM sent DOJ another analysis, calculating that Tremco overcharged the government by at least $11.9 million. *Id.* ¶ 48. According to the complaint, Moore understood that DOJ typically seeks to settle FCA cases for at least two times the amount of damages (in light of the triple damages multiplier available under the statute), and that he was also aware that the amount was likely to continue to rise. *Id.* ¶¶ 47–48. And a few days later, RPM informed DOJ that it would submit a settlement offer by January 11, 2013. *Id.* ¶ 49.

On December 21, 2012, RPM discussed its exposure in the matter with its outside counsel, and it concluded that $27–28 million was a fair estimate, not including any damages multiplier. Compl. ¶ 50. One week later, Moore sent another management representation letter to the audit firm in connection with the second quarter review, stating again that he had not given any substantive attention, or represented the company in connection with, material loss contingencies in excess of $1.2 million. *Id.* ¶ 51.[3] The SEC also alleges that in response to the audit firm's inquiry about the DOJ investigation, Moore told the firm that "no claim has been filed" and "no loss contingency exists." *Id.* ¶ 52.

According to the complaint, RPM's Audit Committee held its second quarterly meeting on January 4, 2013, during which Moore did not disclose: (1) any of the overcharge estimates that had been communicated to DOJ, (2) the fact that RPM had told DOJ that it would submit a settlement offer by January 11, 2013, or (3) the fact that the estimated settlement offer had reached $27–28 million. Compl. ¶ 53. And Moore did not disclose any of this information prior to RPM filing its Form 8-K, or Form 10-Q, for the second quarter on January 8, 2013. *Id.* ¶¶ 53–54. Further, the SEC filings did not disclose any information relating to the DOJ investigation, and the Form 10-Q just contained the same "contingencies" disclosure that was in the first quarter filing. *Id.* ¶¶ 56–58. The SEC claims that as of January 8, 2013, Moore had not disclosed the *qui tam* complaint to the audit firm, and had only told the firm that the range of loss for the DOJ investigation was approximately $5 million. Compl. ¶¶ 53, 60. The agency also alleges that on

---

3       The language in this letter mirrors the language in the first, and also lists RPM's outside counsel and the "Tremco Roofing Matter." *See* Ex. I to Wagener Decl. [Dkt. # 30-10]. And the law firm said the same thing in its audit response letter as it did in the first letter. *See* Ex. K to Wagener Decl. [Dkt. # 30-12].

January 10, 2013, Moore told RPM's CEO for the first time that the potential loss for the DOJ investigation could reach $28 million. *Id.* ¶ 61.

## IV.    The Settlement and RPM's Third Quarter and Fiscal Year End Filings

On January 11, 2013, RPM submitted a settlement proposal to DOJ, offering to settle the investigation and underlying *qui tam* case for $28.3 million. Compl. ¶ 62. Two months later, on March 29, 2013, DOJ provided a counter-offer of $71 million. *Id.* ¶ 64. On April 1, 2013, RPM accrued a $68.8 million liability for the DOJ investigation, and it publicly disclosed this information in its third quarter Form 8-K and Form 10-Q on April 4, 2013. *Id.* ¶¶ 64–65. RPM's Form 10-Q reported a net loss of $42.2 million for the third quarter, compared to a net income of $7.9 million for the same quarter one year earlier. *Id.* ¶ 65. The Form 10-Q stated that the "'primary driver of the decline' was the $68.8 million accrual for the DOJ investigation," and the SEC alleges that both filings "misleadingly indicated that RPM had timely disclosed and accrued for the DOJ investigation." *Id.* At the time RPM made the disclosure, the *qui tam* complaint remained under seal. *Id.* ¶ 66.

The SEC alleges that while RPM's audit firm was preparing its audit for the fiscal year ended May 31, 2013, it met with Moore on June 10, 2013 to inquire about the timing of RPM's accrual for the DOJ investigation. Compl. ¶ 67. According to the complaint, Moore told the audit firm that after RPM's Form 10-Q was filed on January 8, 2013, "RPM completed additional pricing calculations for certain years under investigation[,] and the government threated to unseal the FCA complaint," and therefore the company decided to make a settlement offer. *Id.* The SEC claims that these statements were materially false and misleading because RPM told DOJ that it would make a settlement offer on December 19, 2012, and not after the Form 10-Q was filed, and because

Moore did not disclose that the overcharge estimates had reached $27–28 million by the time RPM filed its Form 10-Q on January 8, 2013. *Id.* ¶ 68.

On July 24, 2013, RPM filed its Form 10-K for the fiscal year ended May 31, 2013. Compl. ¶ 69. This filing disclosed the DOJ investigation and related accrual that RPM recorded in its third quarter, but the SEC alleges that the Form 10-K "misleadingly indicated that RPM timely disclosed and accrued for the DOJ investigation in the third quarter, when in fact disclosure and accrual were required in the first two quarters." *Id.* The agency also claims that the Form 10-K "misleadingly failed to disclose any material weakness in RPM's internal control over financial reporting at any point during the fiscal year, when in fact such weakness existed." *Id.*

At some point in July 2013, RPM paid Moore a cash bonus of $300,000 for the fiscal year ended May 31, 2013, which was partially based on RPM's financial performance. Compl. ¶ 70. In August 2013, RPM and DOJ formally settled the DOJ investigation and underlying *qui tam* complaint for approximately $61 million. *Id.* ¶¶ 2, 71.

On December 5, 2013, RPM filed a Prospectus Supplement with the SEC for a $200 million notes offering, which ended on approximately December 9, 2013. Compl. ¶ 72. Moore oversaw the notes offering, and reviewed the Prospectus Supplement, which the SEC alleges incorporated by reference RPM's false and misleading SEC filings. *Id.*

On April 8, 2014, RPM's CFO and Moore met with the audit firm to discuss a Form S-3 registration statement that RPM intended to file after obtaining the auditor's approval. Compl. ¶ 76. In answering the auditors' questions, Moore allegedly told them that (1) on December 19, 2012, the range of reasonably possible loss for the DOJ investigation was $0 to $10 million; (2) that range stayed the same through January 8, 2013; and (3) the range of loss went up to $28 million, and became probable, between January 8 and 11, 2013. *Id.* The audit firm provided

its consent for the Form S-3 that day, and RPM then filed it with the SEC. *Id.* ¶ 77. But, according to the SEC's account of events, this description is inaccurate because RPM sent the SEC a written chronology of events related to the DOJ investigation on March 31, 2014, which stated that on "December 19, 2012, RPM and Tremco informed the DOJ that a settlement proposal would be submitted by January 11, 2013." *Id.* ¶¶ 73–74. Moore allegedly reviewed and authorized the chronology before it was sent to the SEC. *Id.* ¶ 73.

In July 2014, RPM paid Moore a cash bonus of $400,000 for the fiscal year ended May 31, 2014. Compl. ¶ 78. The SEC alleges that Moore received the bonus based in part on RPM's financial performance during the fiscal year, which was bolstered by the December 2013 notes offering. *Id.*

## V.     RPM's Financial Restatements

In July 2014, RPM's Audit Committee hired independent counsel to conduct an investigation of RPM's disclosure and accrual for the DOJ investigation. Compl. ¶ 79. On August 10, 2014, the independent counsel reported that by the end of the third week of December 2012, it "became 'known to Ed Moore' that RPM's financial exposure in the DOJ investigation was 'going to jump' from around $11 million to around $28 million; that RPM's securities '[d]isclosure counsel [was] not aware' of the overcharge estimates sent to DOJ; and that Moore made 'mistakes,' including 'no disclosure to [the Audit Firm] or audit committee' at the Audit Committee meeting on January 4, 2013." *Id.* ¶ 80. The next day, the Audit Committee directed RPM to restate its financial statements for the first three quarters of fiscal year 2013 by (1) accruing an $11.4 million liability in the first quarter; (2) accruing a $16.9 million liability in the second quarter; and (3) reducing RPM's $68.8 million accrual in the third quarter by $28.3 million, for a total of $40.5 million. *Id.* ¶ 81.

On August 14, 2014, RPM filed a Form 8-K, which admitted that RPM made "errors" in disclosing and accruing for the DOJ investigation, and it filed amended Form 10-Q's for each quarter in fiscal year 2013. Compl. ¶¶ 82–83.[4] The SEC alleges that the "restatement was necessary because RPM's disclosure and accounting errors were material." *Id.* ¶ 82.

## VI.    The SEC's Complaint

The SEC's complaint consists of seven claims:

> Claim 1:  against RPM and Moore alleges that statements contained in the Form 8-K, Form 10-Q, and Prospectus Supplement filed in October 2012; Form 8-K and Form 10-Q filed in January 2013; Form 8-K and Form 10-Q filed in April 2013; Form 10-K filed in July 2013; and the Prospectus Supplement filed in December 2013, were false and misleading in violation of Section 17(a)(2) of the Securities Act.  (Compl. ¶¶ 85–87).

> Claim 2:  against RPM and Moore alleges that they engaged in a course of conduct that operated or would operate as a fraud or deceit upon the purchaser of securities in violation of Section 17(a)(3) of the Securities Act.  (Compl. ¶¶ 88–90).

> Claim 3:  against RPM alleges that statements contained in the Form 8-K, Form 10-Q, and Prospectus Supplement filed in October 2012; Form 8-K and Form 10-Q filed in January 2013; Form 8-K and Form 10-Q filed in April 2013; Form 10-K filed in July 2013; and the Prospectus Supplement filed in December 2013, were inaccurate in violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.  (Compl. ¶¶ 91–93).

> Claim 4:  against RPM alleges that the company did not maintain its books and records in reasonable detail, and did not accurately and fairly reflect the transactions of the company, in violation of Section 13(b)(2)(A) of the Exchange Act. (Compl. ¶¶ 94–96).

---

4      The SEC's complaint only refers to the amended reports for the first and second quarters, but the agency's opposition mentions amended reports for all three quarters, and it provides the reports as exhibits.  *See* Pl.'s Opp. at 12 & n.14; Decl. of Timothy Halloran [Dkt. # 33-1] ("Halloran Decl."); Ex. 3 to Halloran Decl. [Dkt. # 33-4]; Ex. 4 to Halloran Decl. [Dkt. # 33-5]; Ex. 5 to Halloran Decl. [Dkt. # 33-6].  Moreover, the Court may take judicial notice of public records, including SEC filings.  *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993) (observing that "matters of public record," such as statements in the Federal Register, can be examined on a motion to dismiss); *see also DiLorenzo v. Norton*, No. 07-144, 2009 WL 2381327, at *2 n.7 (D.D.C. July 31, 2009) ("Because SEC filings are matters of public record, they are properly the subject of judicial notice.").

Claim 5: against RPM alleges that the company did not devise and maintain a system of internal accounting controls in violation of Section 13(b)(2)(B) of the Exchange Act. (Compl. ¶¶ 97–99).

Claim 6: against Moore alleges that he falsified or caused to be falsified RPM's books and records in violation of Exchange Act Rule 13b2-1. (Compl. ¶¶ 100–02).

Claim 7: against Moore alleges that he made false and misleading statements to accountants in connection with the review or examination of RPM's financial statements in violation of Exchange Act Rule 13b2-2(a). (Compl. ¶¶ 103–05).

## STANDARD OF REVIEW

### I.     Rule 12(b)(6) Standard

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## II.    Rule 9(b) Standard

Federal Rule of Civil Procedure 9(b) imposes heightened pleading standards in fraud cases, as plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "the rule specifically allows allegations of 'intent, knowledge, and other condition of mind' to be averred generally." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (applying Rule 9(b) to claims under the False Claims Act), quoting Fed. R. Civ. P. 9(b). This means that the degree of scienter involved or required for a particular cause of action is not determinative of whether Rule 9(b) applies. *See id.* Rather, the circumstances that must be pled "with specificity are matters such as the 'time, place, and contents of the *false* representations,' such representations being the *element* of fraud about which the rule is chiefly concerned." *Id.* (emphasis in original); *see also Kowal*, 16 F.3d at 1278 ("[T]he pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was

retained or given up as a consequence of the fraud."), quoting *United States v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

The D.C. Circuit applies Rule 9(b)'s pleading standards to claims of misrepresentation under Section 10(b) of the Exchange Act. *See Kowal*, 16 F.3d at 1278. The majority of circuits have held that Rule 9(b) applies to claims under the Securities Act as well if they "sound in fraud," even if a plaintiff need only allege negligence to state a claim. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) ("So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."); *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir. 1996); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992) ("[W]hen § 11 and § 12 claims are grounded in fraud rather than negligence, Rule 9(b) applies."). *But see In re NationsMart Corp. Secs. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) (holding that "the particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11").

The D.C. Circuit has yet to rule on this issue, but courts in this district have held plaintiffs alleging violation of the Securities Act to the heightened pleading standard. *See Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 115 (D.D.C. 2006) (noting that an action under Section 12(a)(2) of the Securities Act must satisfy Rule 9(b)'s requirements); *In re U.S. Office Prods. Secs. Litig.*, 326 F. Supp. 2d 68, 82 (D.D.C. 2004) (observing that "the D.C. Circuit has never stated whether Rule 9(b)'s requirement of particularity applies to claims of violation of Sections 11 and 12(a)(2) of the Securities Act," but that many other circuits have applied Rule 9(b) to those claims).

With regard to claims under Section 17(a)(2) and 17(a)(3) of the Securities Act specifically, which only require allegations of negligence, courts have required the plaintiff to meet Rule 9(b)'s heightened pleading standard. *See, e.g.*, *SEC v. Wey*, No. 15-cv-7116, 2017 WL 1157140, at *8 (S.D.N.Y. March 27, 2017) (dismissing the misrepresentation claim under Section 17(a)(2) because it did not meet Rule 9(b)'s requirements); *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (concluding that Section 17(a) claims "all sound in fraud," so they must be pled with particularity).

The gravamen of the SEC's action under Section 17 here is fraud, and the agency does not argue that applying Rule 9(b) to Claims 1 or 2 would be inappropriate other than in a vague footnote in its opposition. *See* Pl.'s Opp. at 14 n.16. Therefore, the Court will utilize the heightened pleading standard as set out in Rule 9(b) to evaluate defendants' motions to dismiss those claims. However, the remaining claims – which are based on Section 13 of the Exchange Act – will be evaluated under the traditional Rule 12(b)(6) standard.[5]

---

5    Other courts analyzing claims under Section 13 of the Exchange Act, as well as the Exchange Act Rules, have not utilized Rule 9(b)'s heightened pleading standard because claims under that section do not necessarily sound in fraud. *See, e.g.*, *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 87–88 (D.D.C. 2014) (analyzing claims under Section 13(a), Section 13(b)(2)(A), Section 13(b)(2)(B), and Rules 12b-20, 13a-1, 13a-11, and 13a-13); *SEC v. Familant*, 910 F. Supp. 2d 83, 98–100 (D.D.C. 2012) (analyzing claims under Section 13(a), Section 13(b)(2)(A), and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1); *Comput. Network Corp. v. Spohler*, No. 82-0287, 1982 WL 1296, at *1 (D.D.C. March 23, 1982) (recognizing that Section 13 of the Exchange Act "reflects congressional concern that investors be promptly and fully informed" of certain information, and that such claims do not "sound[] only in fraud").

# ANALYSIS

### I.     The SEC has stated a claim against RPM and Moore under Section 17(a)(2) of the Securities Act in Claim 1.

"The Securities Act imposes liability for material misrepresentations or deceit in connection with a securities offering." *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006). Section 17 is a key enforcement provision of the Securities Act, and Section 17(a)(2) provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

15 U.S.C. § 77q(a)(2).

To state a claim under Section 17(a)(2), the SEC must show that defendants were engaged in the offer or sale of securities, that they made material misrepresentations or omitted material facts necessary to make other statements not misleading, and that defendants obtained money or property through the use of the misstatements or omissions. *Id.*; *see also SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 6 (D.D.C. 2000); *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 175 (D.D.C. 1998). One need not demonstrate knowledge of wrongdoing or scienter to establish a violation of Section 17(a)(2); proof of negligence is sufficient. *Aaron v. SEC*, 446 U.S. 680, 696 (1980) (concluding that Section 17(a)(2) "is devoid of any suggestion whatsoever of a scienter requirement"); *Weiss*, 468 F.3d at 855; *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992) (observing that under this provision, a company is "liable merely for omitting disclosure of liabilities negligently – in other words, for failing to disclose liabilities about which [it] *should* have known") (emphasis in original).

The SEC alleges that RPM and Moore made material misstatements or omissions in nine SEC filings between October 2012 and December 2013.  *See* Compl. ¶¶ 36, 42, 54, 65, 69, 72.

## October 2012 Filings

The agency alleges that defendants were required to disclose and accrue for a loss contingency in three SEC filings in October 2012 because by that time, they had received a copy of the *qui tam* complaint filed under the FCA, and they had already acknowledged to DOJ that Tremco overcharged the government on several contracts by more than $11 million.  Compl. ¶¶ 28, 30, 33, 35.  Because none of the filings mentioned the DOJ investigation, the SEC claims that they were false and misleading.  Compl. ¶¶ 37, 39–41.

On October 3, 2012, RPM filed its Form 8-K.  Compl. ¶ 39.  The SEC alleges that this document "purported to provide the company's financial results for its fiscal first quarter but misleadingly failed to disclose the material impact of the DOJ investigation on those results."  Compl. ¶ 39.

On October 4, 2012, RPM filed its Form 10-Q.  Compl. ¶ 40. The Form 10-Q included a section titled "Contingencies," which stated the following:

> We are party to various claims and lawsuits arising in the normal course of business.  Although we cannot precisely predict the amount of any liability that may ultimately arise with respect to any of these matters, we record provisions when we consider the liability probable and reasonably estimable.  Our provisions are based on historical experience and legal advice, reviewed quarterly and adjusted according to developments. In general, our accruals, including our accruals for environmental, warranty, and tax liabilities, discussed further below, represent the best estimate of a range of possible losses.  Estimating probable losses requires the analysis of multiple forecasted factors that often depend on judgments about potential actions by third parties, such as regulators, courts, and state and federal legislatures.  Changes in the amounts of our loss provisions, which can be material, affect our Consolidated Statements of Income.  While it is reasonably possible that excess liabilities, if they were to occur, could be material to operating results in any given quarter or year of their recognition, we do not believe that it is reasonably possible that excess liabilities would

have a material adverse effect on our long-term results of operations, liquidity or consolidated financial position.

Form 10-Q, https://www.sec.gov/Archives/edgar/data/110621/000119312512415475/d408488d 10q.htm; *see also* Compl. ¶¶ 40–41; Ex. P to Wagener Decl. [Dkt. # 30-17]; Decl. of Darren A. Laverne [Dkt. # 31-2] ("Laverne Decl."); Ex. 6 to Laverne Decl. [Dkt. # 31-8]. The SEC alleges that RPM omitted any information about the DOJ investigation, and that the omission made the discussion regarding contingencies misleading because a material loss was probable and reasonably estimable by October 4, 2012. Compl. ¶ 40.

The Form 10-Q also included a section titled "Controls and Procedures," which said:

> Our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures . . . have concluded that as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act (1) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and (2) is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow for timely decisions regarding required disclosure.

Form 10-Q, https://www.sec.gov/Archives/edgar/data/110621/000119312512415475/d408488d1 0q.htm; Compl. ¶ 41. The SEC claims that this section was also false and misleading, particularly because "RPM later admitted in connection with its restatement [that] its disclosure controls and procedures were not effective at the end of the first quarter." Compl. ¶ 41.

On October 19, 2012, RPM filed a Prospectus Supplement with the SEC for a $300 million notes offering. Compl. ¶ 42. The Prospectus Supplement stated:

> It is important for you to read and consider all information contained or incorporated by reference in this prospectus supplement . . . in making your investment decision. . . . We "incorporate by reference" into this prospectus supplement and the accompanying prospectus the information we file with the SEC.

Prospectus Supplement, https://www.sec.gov/Archives/edgar/data/110621/00011931251242875
9/d425482d424b5.htm; Compl. ¶ 42; *see also* Ex. S to Wagener Decl. [Dkt. # 30-20]; Ex. 16 to
Laverne Decl. [Dkt. # 31-18]. Given its express incorporation of other allegedly incomplete SEC
filings, the agency claims that the Prospectus Supplement was also materially false and misleading.
Compl. ¶ 42.

### January 2013 Filings

The complaint alleges that two SEC filings in January 2013 were also false and misleading
because they did not disclose or accrue for the DOJ investigation. Compl. ¶¶ 54–59. The SEC
claims that by early January 2013, RPM and Moore knew that RPM had already agreed to submit
a settlement offer to DOJ by January 11, 2013, and that the settlement offer being prepared was
for approximately $27–28 million. Compl. ¶¶ 49–50.

On January 8, 2013, RPM filed a Form 8-K, as well as a Form 10-Q for the fiscal second
quarter. Compl. ¶ 54. Each filing contained statements identical to those in RPM's Forms 8-K
and 10-Q in October 2012, and the SEC challenges the statements and omissions on the same
grounds. Compl. ¶¶ 57–59; Ex. Q to Wagener Decl. [Dkt. # 30-18]; Ex. 10 to Laverne Decl.
[Dkt. # 31-12].

### April 2013 Filings

The SEC also alleges in the complaint that the Form 8-K and Form 10-Q filed on April 4,
2013, were false and misleading. Compl. ¶ 65.

The Form 8-K described the accrual related to the DOJ investigation:

> As of February 28, 2013, based on discussions occurring on March 29,
> 2013, the Company recorded a $68.8 million accrual associated with an
> investigation of the Company's Building Solutions Group roofing contracts
> with the U.S. General Services Administration (the "GSA"). The substantial
> majority of the accrual relates to the sale of products and services from 2002
> to 2008. The Company's Building Solutions Group is in ongoing settlement

discussions with the U.S. Department of Justice (the "DOJ") and the GSA aimed at resolving the investigation. The Company is cooperating with the investigation, which involves compliance with certain pricing terms and conditions of GSA contracts under which the Company's Building Solutions Group roofing division sold products and services to the federal government. The actual amount of the Company's loss, which remains subject to approval by the DOJ, may vary from the amount of the accrual.

Form 8-K, https://www.sec.gov/Archives/edgar/data/110621/000119312513141254/d514555d8k. htm; *see* Ex. 11 to Laverne Decl. [Dkt. # 31-13].

The Form 10-Q contained the following statement regarding the investigation and accrual:

During the quarter ended February 28, 2012, we recorded a $68.8 million accrual associated with settlement discussions that we are currently having with the DOJ and the GSA Office of Inspector General aimed at resolving an existing investigation. We have cooperated, and continue to cooperate, with the investigation, which involves our compliance with certain pricing terms and conditions of our GSA Multiple Award Schedule contracts under which the roofing division of our Building Solutions Group sold products and services to the federal government. The accrual for this contingency represents our assessment of the amount of probable loss that may result from this matter. The substantial majority of the probable loss relates to the sale of products and services in the period from 2002 to 2008. In assessing our probable loss, we have considered the potentially disputed amounts under the relevant contracts, together with our understanding of policies for resolving such matters. The actual amount of our loss under the terms of any settlement may vary from the amount of the accrual.

Form 10-Q, https://www.sec.gov/Archives/edgar/data/110621/000119312513142237/d481669d1 0q.htm; *see* Ex. 12 to Laverne Decl. [Dkt. # 31-14].

Although these filings publicly disclosed the DOJ investigation and the related accrual for the first time, the SEC claims that both filings "misleadingly indicated that RPM had timely disclosed and accrued for the DOJ investigation," Compl. ¶ 65, when in fact "RPM incorrectly recorded the entire accrual as a charge against income in the third quarter of fiscal 2013, rather than recording appropriate portions of the accrual in the first and second quarters as required by [Generally Accepted Accounting Principles]." Pl.'s Opp. at 16.

### July 24, 2013 Filing

The SEC states in the complaint that RPM's Form 10-K for the fiscal year 2013 suffered from the same defects as the other filings during fiscal year 2013, that is, that the Form 10-K "misleadingly indicated that RPM timely disclosed and accrued for the DOJ investigation in the third quarter," and "misleadingly stated that RPM's internal controls were effective." Compl. ¶ 69; *see* Ex. 13 to Laverne Decl. [Dkt. # 31-15].

### December 5, 2013 Filing

Finally, the complaint also alleges that RPM filed a false and misleading Prospectus Supplement on December 5, 2013 in connection with a $200 million notes offering. Compl. ¶ 72. Because the Prospectus Supplement incorporated the Form 10-K filed on July 14, 2013, as well as all of RPM's other SEC filings, the SEC claims that it was also false and misleading. Compl. ¶ 72; *see* Ex. V to Wagener Decl. [Dkt. # 30-23].

RPM and Moore seek to dismiss the agency's Section 17(a)(2) claim for several reasons. They jointly contend that the agency's claim fails because defendants lacked a duty to disclose or accrue for the DOJ investigation. RPM also argues: (1) that the failure to disclose or accrue for the DOJ investigation was not material; (2) that any alleged misstatements were opinion statements, and the SEC did not allege that defendants knew that they were false; and (3) that the SEC has not alleged that the material misstatements or omissions occurred in the offer or sale of securities. And Moore maintains that the SEC has failed to allege that he obtained money or property by means of an untrue statement or material omission.

## A. The SEC has sufficiently alleged that defendants had a duty to disclose and accrue for the DOJ investigation prior to the April 2013 filings.

### 1. Legal Standard for a Duty to Disclose

Section 17(a)(2) provides that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." 15 U.S.C. § 77q(a)(2). Defendants contend that the Section 17(a)(2) claim based on omissions fails because they lacked a duty to disclose the allegedly omitted information. RPM Mem. at 20–21; Moore Mem. at 17–19.

Although it does not appear that the D.C. Circuit has directly addressed the issue of omissions in the context of Section 17(a), courts in this district have interpreted Section 17(a) based on the principles applied in Section 10(b) and Rule 10b-5 cases because the language of Rule 10b-5, promulgated pursuant to Section 10(b), is extremely similar to the language in Section 17(a). *See, e.g.*, *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 349–50 (D.D.C. 1997); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.[6]

---

6    Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has held in the context of Section 10(b) of the Securities Exchange Act that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 228, 235 (1980) ("But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."). The D.C. Circuit has interpreted *Chiarella* to mean that a duty to disclose under Section 10(b) attaches "only when a party has legal obligations other than a mere duty to comply with the general antifraud proscriptions in the federal securities laws." *Dirks v. SEC*, 681 F.2d 824, 837 (D.C. Cir. 1982), *rev'd on other grounds*, 463 U.S. 646 (1983).

Further, a party has a duty to disclose material information not only when required by a specific rule or regulation but "when silence would make other statements misleading or false." *SEC v. Brown*, 740 F. Supp. 2d 148, 160 (D.D.C. 2010), quoting *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 (D.D.C. 2007). In this second scenario, "[t]he touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor." *Id.*, quoting *In re XM Satellite Radio*, 479 F. Supp. 2d at 178.

Therefore, whether defendants can be held liable for failing to disclose information in their submissions to the SEC turns on whether they had a duty to do so – either because a duty was expressly imposed by rule or statute, or in order to make other statements not misleading. The Court finds that the SEC has alleged sufficient facts to show that defendants had a duty to disclose the DOJ investigation pursuant to accounting standards.

### 2.    Obligation to Disclose or Accrue for the DOJ Investigation Under ASC 450

The SEC points to Generally Accepted Accounting Principles ("GAAP"), in particular, Accounting Standards Codification 450 ("ASC 450"), as a source of the duty to disclose.

Compl. ¶ 23; *see* Pl.'s Opp. at 14–27.  The agency argues that from at least March 2011 through April 2013, the DOJ investigation represented a loss contingency that should have been accrued for, or at least disclosed.  Pl.'s Opp. at 21–27.  Defendants maintain that they had no obligation to do either under ASC 450.  RPM Mem. at 21–24; Moore Mem. at 18–22, 26.

Financial statements included with an issuer's SEC filings must comply with GAAP, and financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading.  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016); 17 C.F.R. § 210.4-01.  The SEC relies on ASC 450, which provides accounting guidance for the accrual and disclosure of a loss contingency, which is defined as "an existing condition, situation or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur."  Compl. ¶ 23; *see also* Ex. C. to Wagener Decl. [Dkt. # 30-4] ("ASC") at 450-10-20.  Loss contingencies can include actual or possible claims, as well as pending or threatened litigation.  Compl. ¶ 23; *see also* ASC at 450-20-05-10.  The SEC contends that the DOJ investigation was a loss contingency that needed to be disclosed because it was reasonably possible that RPM would suffer a loss, and that it needed to be accrued for because the information available to RPM and Moore suggested that a loss was probable and it could be reasonably estimated.  *See* Pl.'s Opp. at 21–27.

The applicable accounting standards set out different rules for claims that have been asserted and those that have yet to be asserted.  Pursuant to ASC 450-20-50, for a claim that has been asserted, an issuer must disclose a loss contingency if there is "at least a reasonable possibility" that a loss may be incurred, even if the amount cannot be reasonably estimated.  ASC at 450-20-50-2; *id.* at 450-20-50-3; *id*. at 450-20-50-5; *see also* Compl. ¶ 23.  A loss contingency

is reasonably possible if the likelihood that it will occur "is more than remote but less than likely." ASC at 450-20-20.

With respect to claims that have not yet been asserted, disclosure is not required "if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment" unless: (1) "[i]t is considered probable that a claim will be asserted," and (2) "[t]here is a reasonable possibility that the outcome will be unfavorable." ASC at 450-20-50-6.

Also, ASC 450 provides with respect to an "unasserted claim" that the entity must consider the probability of the assertion of claims and the possibility of loss to determine if the investigation must be disclosed. ASC at 450-20-55-14. If assertion of a claim "is not probable, no accrual or disclosure would be required." *Id.* at 450-20-55-15. But if assertion of a claim is probable, then disclosure would be "required in either of the following circumstances: (a) [a]n unfavorable outcome is probable but the amount of loss cannot be reasonably estimated; [or] (b) [a]n unfavorable outcome is reasonably possible but not probable." *Id.* And "[i]f an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required." *Id.* at 450-20-55-14.

To determine the probability of an unfavorable outcome in any litigation, claim, or assessment, ASC 450 lists a number of factors the company may consider, including: (1) the nature of the litigation, claim, or assessment; (2) the progress of the case; (3) the opinions of legal counsel or other advisors; (4) the experience of the entity in similar cases; (5) the experience of other entities; and (6) "any decision of the entity's management as to how the entity intends to respond to the lawsuit, claim, or assessment (for example, a decision to contest the case vigorously or a decision to seek an out-of-court settlement)." ASC at 450-20-55-12.

ASC 450 requires that an issuer record an accrual for a loss contingency as a charge against income if an unfavorable outcome is determined to be probable, and the amount of loss can be reasonably estimated. ASC at 450-20-25-2; *id.* at 450-20-55-13; *id.* at 450-20-55-16. However, the "filing of a suit or formal assertion of a claim or assessment does not automatically indicate that accrual of a loss may be appropriate." *Id.* at 450-20-55-13.

> ### a. The SEC has alleged that defendants had a duty to disclose and accrue for the DOJ investigation in RPM's October 2012 filings.

Given the two sets of standards, it is necessary to determine at the outset whether the investigation in question was an "asserted" or an "unasserted" claim under ASC 450 to identify the elements required to state a claim that defendants breached a duty to disclose.

RPM and Moore knew of the existence of the whistleblower *qui tam* complaint by at least August 9, 2012. Compl. ¶ 28. Moore contends that the claim was "unasserted" in the October 2012 time frame because the government had not yet given any indication whether it intended to intervene in the *qui tam* action and assert a claim against RPM. Moore Mem. at 18–22. Since the government claim was "unasserted," Moore argues that ASC 450-20-50-6 required the SEC to allege that it was probable that a claim would be asserted, and that there was a reasonable possibility that an outcome of an asserted claim would be unfavorable, and that in the absence of those allegations, the complaint does not allege the existence of a duty to disclose. *Id.*[7]

The SEC takes the position that a claim had indeed been asserted against RPM since a private *qui tam* complaint alleging a violation of the FCA had been filed against RPM in federal court. Pl.'s Opp. at 23. Moreover, it argues that even if the original complaint did not qualify as an "asserted" claim because the United States had not yet intervened, the higher probability

---

7    RPM does not make any argument as to whether the claim was "asserted" or "unasserted," but rather focuses on how ASC 450 does not require companies to disclose settlement offers in general. RPM Mem. at 21–24.

standard for an "unasserted" claim would not apply because DOJ had at least "manifested . . . an awareness of a possible claim," which would preclude the application of ASC 450-20-50-6. *Id.*, quoting ASC 450-20-50-6. Thus, to state a claim that disclosure was required, all the SEC had to allege was that there was a "reasonable possibility" that a loss could occur. *See* Pl.'s Opp. at 23; ASC 450 450-20-50-2; *id.* at 450-20-50-3; *id* at 450-20-50-6. The Court agrees.

First, the SEC has plausibly alleged that a claim had already been asserted against RPM. Paragraph 17 of the complaint states that the *qui tam* action was filed in July 2010, and paragraphs 18, 19, 20, 21, 22, and 28 allege that RPM and Moore were aware of the complaint and knew that DOJ was actively engaged in an investigation to decide whether to intervene in it. Compl. ¶¶ 17–22, 28. And, even if a claim on the part of the United States was as yet "unasserted," the ASC 450 guidelines surrounding disclosure would apply because DOJ had certainly "manifested" an "awareness of a possible claim" by issuing subpoenas and engaging in communications with RPM and RPM's counsel related to the amount of the overpayments. *See, e.g.*, Compl. ¶¶ 18, 30, 33, 48, 51.

ASC 450 does not provide any guidance as to what it means to "manifest" an "awareness of a possible claim." Moore heavily relies on *In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016) for the proposition that a government agency cannot be said to have "manifested awareness" of a claim simply because it is investigating a potential violation of law. Moore Mem. at 21. In that case, the complaint alleged that defendants were aware of an active SEC investigation into allegedly false statements and omissions made in connection with certain corporate transactions, and that the company ultimately settled with the SEC prior to the filing of any enforcement action. *In re Lions Gate*, 165 F. Supp. 3d at 1. The court granted the company's motion to dismiss, holding that a "government investigation, without

more, does not trigger a generalized duty to disclose," *id.* at 12, and that the company did not have a duty to disclose or accrue under ASC 450 because the investigation itself did not qualify as "pending or threatened litigation," and there was no way the loss could have been estimated because the settlement amount was not revealed until the company accrued an expense for the possible settlement. *Id.* at 15, 21–22.

*In re Lions Gate* is not binding on the Court, and in any event, it is easily distinguishable since RPM and Moore had knowledge of more than just the mere existence of an open investigation; they knew that a federal civil complaint alleging violations of the False Claims Act was actually pending, and that DOJ was in the midst of determining whether it was going to intervene and take over the case. And the SEC's complaint here alleges that by September of 2012 at the latest, RPM, through its outside counsel, was engaged in quantifying the scope of the overcharge to the government, which, under the FCA, could be trebled.

For those reasons, this case is more similar to *Indiana Public Retirement System v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016). In that case, the defendant provided various services to government agencies, and it became the prime contractor on a project with New York City to develop an automated timekeeping program known as CityTime. *Id.* at 89. The defendant became involved in an elaborate kickback scheme, which required workers to inflate billable hours and hourly rates, and ultimately the city began evaluating whether it would seek recovery of its payments to the defendant in connection with the project. *Id.* But the defendant did not disclose its potential liability related to the CityTime project in its Form 10-K. *Id.* The court held that the plaintiff had adequately alleged that the defendant violated Financial Accounting Standard No. 5 ("FAS 5"), the precursor to ASC 50, by failing to disclose a loss contingency in its Form 10-K filing arising from the city's "manifest awareness" of a possible claim against the defendant. *Id.*

at 93–94. Further, the court concluded that the "reasonable possibility" standard of FAS 5 applied since the "[c]ity had manifested an awareness of a possible, sizeable claim against" the defendant where, among other things, the city had already filed a criminal fraud complaint against company principals that "alluded to" the company's improper conduct. *Id.*

Therefore, applying ASC 450, to state a claim that defendants had an obligation to disclose the DOJ investigation, the SEC must have alleged that there was a "reasonable possibility" that a loss could occur. And it has done so. According to the complaint, defendants "knew or should have known" that it was "reasonably possible . . . that RPM would incur a material loss in connection with the DOJ investigation," based on the fact that they knew about the *qui tam* action, the company had already estimated that Tremco overcharged the government by at least $11.4 million, and RPM's counsel had been in communication with the DOJ about this figure. Compl. ¶¶ 28, 30–31, 33, 37. These facts give rise to the plausible allegation that it was "reasonably possible" at the time of the October 2012 filings that RPM could have suffered a loss.

RPM contends that it did not have an obligation to disclose or accrue for the DOJ investigation under ASC 450 because the guidelines do not require the disclosure of contemplated or exchanged settlement offers. RPM Mem. at 22–23. But this argument is beside the point. Nowhere in SEC's complaint does it allege that RPM's filings were false and misleading because the company did not disclose its actual settlement offer or settlement discussions with DOJ. Rather, Claim 1 alleges that RPM had a duty to disclose the DOJ investigation as a loss contingency based on the information it knew prior to April 2013. And one piece of that puzzle was the contemplated settlement offer, which ASC 450 recognizes as one factor a company may consider in determining if disclosure or accrual is necessary. *See* ASC at 450-20-55-12; *id.* at 450-22-55-18; *id.* at 45-22-55-36; Pl.'s Opp. at 20.

Turning to whether accrual was necessary, Moore maintains that the company had no duty to accrue a loss in the October 2012 filings because a loss was not "probable" at this time since the government had not indicated if it planned to intervene in the *qui tam* action. Moore Mem. at 18–19. Further, he argues that the SEC does not allege, as he insists it must, that Moore knew then that RPM was likely either to settle or lose at trial. *Id.* at 19. But the SEC's allegations are sufficient at this stage to survive a motion to dismiss. The SEC claims that defendants "knew or should have known" that it was "probable and reasonably estimable [] that RPM would incur a material loss in connection with the DOJ investigation," because they were aware of the *qui tam* complaint, had already calculated $11.4 million worth of liability to the government, and had begun discussing settlement options with DOJ. Compl. ¶¶ 28, 30–31, 33, 37. This information supports a plausible inference that it was probable that a loss would occur, and that the loss could be reasonably estimated to be at least $11 million. Therefore, the SEC has adequately alleged that defendants violated ASC 450 by failing to disclose and accrue for a loss contingency in RPM's three October 2012 filings.

> **b.**     **The SEC has alleged that defendants had a duty to disclose and accrue for the DOJ investigation in RPM's January 2013 filings.**

Given the additional facts that had come to light by the time RPM made its filings on January 8, 2013, the Court also finds that the SEC has sufficiently alleged that defendants had a duty to disclose and accrue for the DOJ investigation in the January 2013 filings, and therefore adequately alleged that defendants violated ASC 450 at that time as well.

Building on the facts alleged in connection with the October 2012 filings, the complaint goes on to allege that RPM learned in November 2012 that DOJ expected any settlement offer to be reached by mid-January, and that by mid-December 2012, RPM told DOJ that it would submit a settlement offer by January 11, 2013. Compl. ¶¶ 46, 49. Further, on December 21, 2012, RPM

representatives, including Moore, discussed the components of the planned settlement offer, which they had calculated at $27–28 million. *Id.* ¶ 50. RPM ultimately submitted a 44-page settlement proposal to the DOJ for $28.3 million on January 11, 2013. *Id.* ¶ 62.

Based on these additional facts and the allegations of what transpired before October 2012, the SEC has alleged that as of January 8, 2013, it was reasonably possible that a loss would occur and that therefore RPM was obligated to disclose the DOJ investigation. And, it has sufficiently alleged that as of that date, the loss was probable, since RPM was in the process of preparing a settlement agreement involving a more than $20 million payment, and it had already promised to deliver it to DOJ by January 11, 2013. These facts, coupled with the fact that RPM delivered a lengthy settlement proposal to DOJ three days after the filings, give rise to a plausible inference that by January 8, RPM and Moore knew that it was probable that it would settle with DOJ and suffer a loss. Further, the loss could be reasonably estimated since RPM had estimated its potential liability at $28.3 million and included that term in its settlement offer. Therefore, the agency has adequately alleged that defendants violated ASC 450 by failing to disclose and accrue for the loss contingency in its January 8, 2013 filings.[8]

**B.      The SEC has sufficiently alleged that the misstatements or omissions were material.**

Defendants can only be liable for a violation of Section 17(a)(2) if they made misrepresentations or omissions that were material. 15 U.S.C. § 77q(a)(2). The Court concludes that the SEC has sufficiently alleged that the misstatements or omissions were material.

---

8      The SEC also alleges that Item 303 of Regulation S-K ("Item 303") and Rule 12b-20 supply independent bases to find that RPM had a duty to disclose the DOJ investigation. *See* Compl. ¶ 38. However, the Court does not have to reach this issue because it has already concluded that the SEC alleged a violation of the duty to disclose created by ASC 450.

A statement or omission is material under the federal securities laws if there is "a substantial likelihood that a reasonable shareholder [or investor] would consider [the information] important." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (adopting *TSC Industries* standard for materiality to Section 10(b) and Rule 10b-5 claims); *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. "[T]he materiality of a misrepresentation or omission must be assessed as of the time of the contested transaction." *Media Gen., Inc. v. Tomlin*, 387 F.3d 865, 869 (D.C. Cir. 2004). The question of whether alleged misrepresentations or omissions are material is a mixed question of law and fact. *Id.*

Because materiality is a mixed question of law and fact, courts have cautioned against granting a motion to dismiss based on the failure to plead materiality "unless [the information is] so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (disagreeing with the district court "at this preliminary stage of litigation that the alleged omissions and misstatements" were "obviously unimportant"), quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *see Brown*, 740 F. Supp. 2d at 167 (finding that the agency had alleged a material omission because "reasonable minds could differ as to whether" the information was "obviously unimportant"), quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Courts have held that the issuance of a restatement sufficiently pleads materiality because under GAAP, "a restatement issues only when errors are material." *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (concluding that the fact that AOL "restated its revenues" was sufficient

to establish that its misstatements or omissions were material); *see also SEC v. Montessoro*, 768 F. Supp. 2d 1244, 1264 (S.D. Fla. 2011) (finding that subsequently issued amended annual reports demonstrated that the statements were material); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) ("Pursuant to Generally Accepted Accounting Principles ('GAAP'), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued."). Further, allegations that a decision affects more than five percent of total assets has been found to suggest materiality. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (observing that "the five percent numerical threshold is a good starting place for assessing materiality of the alleged misstatement," and concluding that "[a]n accounting classification decision that affects less than one-third of a percent of total assets does not suggest materiality").

RPM urges the Court to conclude as a matter of law that the alleged misstatements and omissions were immaterial because there "was no appreciable impact on RPM's stock price either (i) after RPM disclosed and accrued $68.8 million for the DOJ investigation, or (ii) after RPM issued its August 14, 2014 restatement to spread that accrual across three quarters." RPM Mem. at 36. While some courts have held that information may be deemed immaterial as a matter of law if public disclosure of the information has a negligible effect on stock price, *see Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000), other courts have rejected this line of reasoning. *See No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (declining to adopt the bright-line rule from *Oran* "because adoption of such a rule would contravene the Supreme Court's holding in *Basic, Inc. v. Levinson*," which adopted the "reasonable investor" standard for determining materiality); *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[W]hether a public company's stock price moves up or down or stays

the time . . . does not establish the materiality of the statements made."); *see also SEC v. Stanard*, No. 06-cv-7736, 2009 WL 196023, at *25 (S.D.N.Y. Jan. 27, 2009) (concluding that "the failure of the market to react to the retrospective correction" of the financial statements "is of little significance in evaluating the materiality of the false statements when made" because "a disclosure that genuine earnings had been shifted from one quarter to another several years earlier would not affect the perceived value of the company as of the time of the disclosure").

The D.C. Circuit does not appear to have articulated a position on this issue; however, it has held that materiality "does not require a showing of actual harm to investors." *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1097 (D.C. Cir. 2005) (vacating the SEC's order sanctioning petitioner for securities violations, but recognizing that substantial evidence supported the SEC's finding of materiality).

Given that principle and the guidance that can be derived from the case law in general, and taking all of the factual allegations in this case as true as the Court must at the motion to dismiss stage, the Court does not believe it is appropriate to dismiss this action at this early juncture for failure to plead materiality. Not only did RPM restate its financial statements for the first three quarters of fiscal 2013, in which it admitted errors in disclosing and accruing for the DOJ investigation as well as a material weakness in the company's internal controls, *see* Compl. ¶¶ 80–83, but the SEC has alleged that the misstatements and omissions were material because as of October 2012, the $11.4 million overcharge estimate "equaled approximately 30% of RPM's net income for the first quarter." *Id.* ¶ 35. While the question of materiality of these misstatements or omissions may arise again on summary judgment after the record has been more fully developed, the Court cannot conclude at this stage that disclosure of the DOJ investigation, or accrual of the potential loss as a charge against income, and accurate statements about RPM's internal controls,

were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *See Litwin.*, 634 F.3d at 717.

### C.   Even if the statements contained within the October 2012 and January 2013 filings can be characterized as opinion statements, the SEC has adequately alleged that they were false or misleading.

RPM argues that none of the statements within its SEC filings for the first and second quarters of fiscal 2013 could be false or misleading because each SEC filing reflected "a corporate decision applying a subjective accounting standard . . . [which] is a statement of *opinion*, not a statement of *fact*." RPM Mem. at 19 (emphasis in original). Although the company does not refer to any statement in particular, RPM's reply seems to be concerned only with "RPM's financial statements concerning loss contingencies." *See* RPM Reply at 4. The SEC maintains that "it is far from clear that RPM's misstatements should be considered expressions of opinion," but that in any event, it has provided enough facts to allege that those statements were misleading by omission. Pl.'s Opp. at 30. The Court agrees.

The misstatements at issue were contained within RPM's Form 10-Q filed on October 4, 2012, and in its Form 10-Q filed on January 8, 2013:

> We are party to various claims and lawsuits arising in the normal course of business. Although we cannot precisely predict the amount of any liability that may ultimately arise with respect to any of these matters, we record provisions when we consider the liability probable and reasonably estimable. Our provisions are based on historical experience and legal advice, reviewed quarterly and adjusted according to developments. In general, our accruals, including our accruals for environmental, warranty, and tax liabilities, discussed further below, represent the best estimate of a range of possible losses. Estimating probable losses requires the analysis of multiple forecasted factors that often depend on judgments about potential actions by third parties, such as regulators, courts, and state and federal legislatures. Changes in the amounts of our loss provisions, which can be material, affect our Consolidated Statements of Income. While it is reasonably possible that excess liabilities, if they were to occur, could be material to operating results in any given quarter or year of their recognition, we do not believe that it is reasonably possible that excess liabilities would

have a material adverse effect on our long-term results of operations, liquidity or consolidated financial position.

Form 10-Q, https://www.sec.gov/Archives/edgar/data/110621/000119312512415475/d408488d1 0q.htm; Form 10-Q, https://www.sec.gov/Archives/edgar/data/110621/000119312513006770/d 446394d10q.htm; *see* Compl. ¶¶ 40–41; Ex. P to Wagener Decl. [Dkt. # 30-17]; Ex. 6 to Laverne Decl. [Dkt. # 31-8].

Both parties rely on the Supreme Court's recent decision in *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). In that case, the Supreme Court analyzed whether a company's statement about its compliance with legal requirements in a registration statement could violate Section 11 of the Securities Act since the statute creates "two ways to hold issuers liable for the contents of a registration statement – one focusing on what the statement says and the other on what it leaves out." 135 S. Ct. at 1323; *see* 15 U.S.C. § 77k(a).[9] The two statements at issue were cast in the form of an opinion:

- We believe our contract arrangements with other healthcare providers, our pharmaceutical suppliers and our pharmacy practices are in compliance with applicable federal and state laws.

- We believe that our contracts with pharmaceutical manufacturers are legally and economically valid arrangements that bring value to the healthcare system and the patients that we serve.

*Omnicare*, 135 S. Ct. at 1324 (citations omitted).

---

9      Section 11 provides:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may] sue.

15 U.S.C. § 77k(a). This statute, like Section 17(a)(2), does not require proof of scienter. *Omnicare*, 135 S. Ct. at 1323, citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983).

While "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong," *id.* at 1327, the Court explained that Section 11's false statement provision can be applied to expressions of opinion because "every such statement explicitly affirms one fact: that the speaker actually holds the stated belief." *Id.* at 1236. Therefore, Section 11 would subject the issuer to liability if the speaker made a statement and knew that it was false. *Id.* The Court went on to hold that both statements at issue qualified as opinions, and that since the plaintiff had "not contest[ed] that Omnicare's opinion was honestly held," the complaint did not state a claim based on a false statement. *Id.* at 1327.

Based on that precedent, RPM argues that the SEC's claim should be dismissed because the SEC filings contained opinions, and the complaint does not plausibly allege that RPM expressed the opinions with the knowledge that they were false. *See* RPM Mem. at 19. But RPM disregards the remainder of the Supreme Court's decision in which it held that Section 11 plaintiffs could state a claim based on omissions related to an opinion, and it remanded the case for further proceedings. *Omnicare*, 135 S. Ct. at 1327–33.

The Supreme Court explained that an "omission of a fact can make a statement of opinion . . . , even if literally accurate, . . . misleading to an ordinary investor," and that this inquiry is objective and "depends on the perspective of a reasonable investor." *Omnicare*, 135 S. Ct. at 1327–28. The Court observed that the words "we believe" or "we think" "can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors." *Id.* at 1331. The point of the omissions clause in Section 11 is that an issuer may not say one thing but hold back another, and it "asks what [a reasonable person] would naturally understand a statement to convey beyond its literal meaning." *Id.* at 1331–32. The clause also involves

"considering the foundation [a reasonable person] would expect an issuer to have before making the statement." *Id.* at 1332.

The Court then detailed what a plaintiff must allege in order to state a claim based on Section 11's omissions clause:

> Section 11's omissions clause, after all, is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading. To press such a claim, an investor must allege that kind of omission – and not merely by means of conclusory assertions. To be specific: The investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Omnicare*, 135 S. Ct. at 1332 (internal citation omitted).

If the *Omnicare* ruling is to be applied to a Section 17(a)(2) claim,[10] the SEC's complaint passes the objective test. The facts alleged in the complaint about what was known to Moore and RPM but omitted from the filings would render the statements misleading to a reasonable reader. Also, the complaint supports a plausible inference that RPM's statements about contingencies did not rest on meaningful inquiry, and did not fairly align with the facts known at the time.

The SEC alleged the following facts with regard to what was known prior to RPM's SEC filing on October 4, 2012:

---

10      The D.C. Circuit has not yet ruled on the question of whether *Omnicare* applies to Section 17(a)(2) claims as well, but other courts have held that the Section 11 decision would apply to all antifraud provisions in the securities laws. *See, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 211–12 (2d Cir. 2016) (applying *Omnicare* to securities fraud claims arising under Section 10(b) and Rule 10b-5, in addition to Section 11, without distinguishing among the provisions); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (holding that the standards for pleading falsity of opinion statements articulated in *Omnicare* apply to Section 10(b) and Rule 10b-5 claims).

- August 9, 2012: RPM personnel, including Moore, reviewed the *qui tam* complaint, but Moore did not disclose the complaint to the audit firm. Compl. ¶¶ 28–29.

- September 12, 2012: RPM's outside counsel met with DOJ, with Moore's knowledge and authorization, and informed DOJ that Tremco overcharged the government by at least $11 million. Compl. ¶ 30.

- September 28, 2012: RPM's audit firm asked Moore about the status of the DOJ investigation, and Moore told the firm that "no claim had been asserted" and the matter was "investigative in nature and not in litigation." Compl. ¶ 31.

- October 1, 2012: Moore sent a management representation letter to the audit firm, stating that neither he, nor any lawyers he supervises, had given substantive attention to, or represented the company in connection with material loss contingencies exceeding $1.2 million. Compl. ¶ 32.

- October 1, 2012: RPM sent DOJ a written analysis, with Moore's knowledge, estimating that Tremco had overcharged the government by approximately $11.4 million. Compl. ¶ 33.

- October 2, 2012: At RPM's Audit Committee's meeting attended by the CEO, CFO, Moore, and others, Moore did not disclose the $11.4 million overcharge estimate. Compl. ¶ 34.

- October 2, 2012: The Chairman of RPM's Audit Committee communicated to those in attendance, including Moore, that the company was "not going to be accepting of ongoing extraordinary charges or one-time charges" against income because "that would [not] bode well for the company and [] the impression of our shareholders and others of how we run the business." Compl. ¶ 43.

Even more facts were alleged to have been known by Moore and RPM prior to the January

8, 2013 filing:

- December 14, 2012: With Moore's knowledge and authorization, RPM sent DOJ another analysis calculating that Tremco overcharged the government by a total of at least $11.9 million. Compl. ¶ 48.

- December 19, 2012: With Moore's knowledge and authorization, RPM informed DOJ that it would submit a settlement offer to resolve the underlying *quit tam* action by January 11, 2013. Compl. ¶ 49.

- December 21, 2012: RPM's counsel held a conference call with RPM personnel, including Moore, to discuss the DOJ investigation and the settlement offer. The parties concluded that the settlement offer would total approximately $27–28 million. Compl. ¶ 50.

- December 28, 2012: Moore sent another management representation letter to the audit firm stating that he, nor any lawyers he supervises, had given substantive attention to, or represented the company in connection with material loss contingencies exceeding $1.2 million. Compl. ¶ 51.

- December 28, 2012: RPM's audit firm asked Moore about the status of the DOJ investigation as part of its second quarter review, and Moore told the firm that "no claim has been filed" and "no loss contingency exists." Compl. ¶ 52.

- January 4, 2013: During the second quarterly meeting with RPM's Audit Committee, Moore updated those in attendance about the DOJ investigation, but he did not disclose any overcharge estimates that had been calculated, that RPM had told DOJ that it would submit a settlement offer by January 11, 2013, or that the settlement calculations had reached $27–28 million. Compl. ¶ 53.

RPM argues that its filings reflect a judgment that GAAP and the securities laws did not require disclosure or accrual for the DOJ investigation. The Court has already detailed why the complaint fairly alleges that the omissions did not comport with GAAP, and the same facts make RPM's statements that it had arrived at this belief or judgment misleading. And even if such a judgment was actually made, the company arrived at its conclusion when critical information was allegedly being withheld from RPM's CFO, CEO, Audit Committee, and outside audit firm. A reasonable person reading a company's judgment about accounting principles would expect that these people and entities would have been fully informed prior to making any statements regarding loss contingencies in the SEC filings.

Therefore, even if the statements in the SEC filings can be classified as "opinions," the Court finds that the SEC has alleged sufficient facts to state a claim under Section 17(a)(2).

**D. The SEC has adequately alleged the offer or sale of securities.**

In discussing Section 17(a), the Supreme Court has held that the language "in the offer or sale of any securities" is "expansive enough to encompass the entire selling process." *United States v. Naftalin*, 441 U.S. 768, 773 (1979). The statute does not require that the fraud occur during "any particular phase of the selling transaction." *Id.* Rather, Section 17(a) "was intended

to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." *Id.* at 778. RPM contends that the SEC has not alleged that each misstatement or omission took place in the offer or sale of a security, and it insists that an allegation that a company's stock is publicly traded is insufficient to meet the "offer or sale" requirement. RPM Mem. at 39–41; RPM Reply at 19–21.

Many courts have concluded that an allegation that the company's stock was publicly traded is sufficient to plead this element under Section 17(a)(2). *See, e.g.*, *SEC v. Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (finding that an allegation that a company's stock was publicly traded, alone, was sufficient to state a claim); *SEC v. Farmer*, No. 4:14-cv-2345, 2015 WL 5838867, at *10 (S.D. Tex. Oct. 7, 2015) (holding that the "offer or sale" requirement is met as long as the company's securities were sold and purchased during the time period "in which the fraudulent statements were made"); *SEC v. Goldsworthy*, No. 06-10012, 2008 WL 8901272, at *12 (D. Mass. June 11, 2008) ("[W]here a defendant has made false or misleading statements in materials typically relied upon by investors engaged in the ordinary market trading of securities, the requirement that fraud occur 'in the offer or sale' is satisfied.").

RPM relies on one court's decision in this district for the proposition that an allegation that a company's stock was traded on a public exchange is insufficient to meet the "offer or sale" element. RPM Mem. at 39–40, citing *Brown*, 740 F. Supp. 2d at 163–64. However, that case is not binding authority and it is distinguishable since the complaint in question did not allege that *any* offer or sale took place during the time period in which the company filed multiple annual reports and proxy statements. *See Brown*, 740 F.Supp.2d at 163–64. Here, the SEC alleges more than the fact that RPM was a publicly traded company. It asserts that RPM was involved in two notes offerings, one in October 2012 and one in December 2013, Compl. ¶¶ 42, 72, as well as that

"RPM's common stock was registered with the SEC . . . and traded continuously on the New York Stock Exchange under the ticker symbol 'RPM.'" *Id.* ¶ 14. Therefore, the SEC has adequately alleged that each of the filings containing allegedly false or misleading statements were in the offer or sale of RPM securities.

### E. The SEC has adequately alleged that Moore obtained money or property.

Section 17(a)(2) of the Securities Act provides that it is unlawful "for any person in the offer or sale of securities . . . dirrectly or indirectly . . . to obtain money or property by means of any untrue statement of material fact." 15 U.S.C. § 77q(a)(2). Moore argues that the SEC's Section 17(a)(2) claim fails to state a claim against him for the independent reason that it does not allege that he obtained money or property by means of any material misstatement or omission. Moore Mem. at 35–36. The Court disagrees.

An allegation that ties a company officer's received bonus to the company's performance has been found to be sufficient to state a claim under Section 17(a)(2). *See Mudd*, 885 F. Supp. at 670 (concluding that the complaint's allegations that two company officers obtained money or property by means of their false statements "because each received a bonus that was tied to both [the company's] performance and their own personal performance in attaining individual year-end goals" were sufficient to state a claim); *see also SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1379 (S.D. Fla. 2014) (holding that allegations that a person received "increased compensation based on the volume of business enlarged by the alleged fraudulent activity" was sufficient to plead a violation of Section 17(a)(2) of the Securities Act). But if a court is left guessing as to whether, and to what extent, the officer has an equity stake in the company and how the officer's overall compensation was affected by making a false statement, courts have been inclined to grant a defendant's motion to dismiss. *See Wey*, 2017 WL 1157140, at *12 (concluding that the complaint failed to allege that

the company's lawyer obtained money or property because "[v]ery little [could] be learned from the complaint about [his] compensation and how any false statement may have benefited him").

Here, the SEC alleged that "Moore had a personal interest in RPM's stock price because, as of August 31, 2012, he owned 65,952 shares of RPM stock – worth more than $1.8 million – plus 65,000 RPM stock options." Compl. ¶ 44. But the SEC does not allege that the stock price went up or that any movement in the share price affected the value of Moore's investment over the course of the relevant time period. So, the assertion that Moore owned stock, without more, may reflect a reason to ensure that the price does not fall, but it does not sufficiently allege that Moore obtained money by means of any material misstatements or omissions.

But the SEC still did plead that Moore obtained money by means of the material misstatements or omissions by alleging that at the end of the fiscal year ended May 31, 2013, and May 31, 2014, "RPM paid Moore a cash bonus" of $300,000 and $400,000, respectively, "based in part on RPM's financial performance during the year, including the company's net income, which was bolstered by the October 2012 [and December 2013] notes offering[s]." Compl. ¶¶ 70, 78. The SEC's allegations are sufficient at this stage to give rise to a plausible inference that some portion of the bonus money Moore was paid as a result of the company's financial performance was obtained by means of false and misleading statements since the company's financial statements were implicated in both notes offerings. However, the SEC will be required to prove this allegation as the matter moves forward.

Since the SEC has successfully stated a claim under Section 17(a)(2), defendants' motions to dismiss Claim 1 will be denied.

## II. The SEC has stated a claim against RPM and Moore under Section 17(a)(3) of the Securities Act in Claim 2.

Under Section 17(a)(3), it is unlawful for any person in the offer or sale of securities "to engage in any transaction, practice, or course of conduct which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). Just as with Section 17(a)(2), proof of negligence is sufficient to establish a violation of this provision. *See Aaron*, 446 U.S. at 697. The Supreme Court has observed that Section 17(a)(3) "plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible." *Id.* (emphasis in original).

To establish "scheme liability" under Section 17(a)(3),[11] the alleged conduct must include more than the same misrepresentations or omissions underlying the misstatement claims. *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)); *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a

---

[11]    Although there is a dearth of case law on the subject, courts appear to typically analyze Section 17(a)(3) and Rule 10b-5(c) claims in conjunction, or at least under the same standard. *See, e.g.*, *SEC v. Coffey*, 493 F.2d 1304, 1309 (6th Cir. 1974) (concluding that the use of the term "prime" tended to operate as a scheme to defraud within the meaning of both Section 17(a)(3) and Rule 10b-5(c)); *SEC v. Thompson*, 238 F. Supp. 3d 575, 596 n.10 (S.D.N.Y. 2017) (recognizing that because Section 17(a)(3) and Rule 10b-5 "have similar requirements," it is not necessary to distinguish between them unless it is material to the analysis); *SEC v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) (applying the same standard under Section 17(a)(3) and finding that the complaint plausibly alleged a course of conduct beyond misrepresentations).

market manipulation claim under Rule 10b-5(a) and (c).”); *see also Brown*, 740 F. Supp. 2d at 172

(analyzing a claim under Rule 10b-5(c) and finding the allegation that the defendant failed to file

statements properly sufficient to withstand a motion to dismiss).

Scheme liability is only appropriate if Section 17(a)(2) “cannot fully cover the deceptive

acts.” *See Familant*, 910 F. Supp. 2d at 93 (finding the complaint alleged conduct beyond mere

misstatements and omissions to satisfy 10b-5(c) scheme liability). Liability may arise under

Section 17(a)(2) and 17(a)(3) based on the same set of facts, but only if the plaintiff alleges both

that the defendants made misrepresentations in violation of the statute, and that the defendants

undertook a deceptive course of conduct that went beyond the misrepresentations. *See Brown*, 740

F. Supp. 2d at 172, citing *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005); *Stoker*, 865

F. Supp. 2d at 467. A defendant will not be liable under subsection (3) if the only allegation is

that the defendant was a participant in a scheme through which the misleading statements were

made. *See Spot Runner*, 655 F.3d at 1057–58 (affirming dismissal of claim where “[t]he fraudulent

scheme allegedly involved the [d]efendant-[a]pellees planning together to not disclose the

[f]ounder’s sale of securities in the secondary offering, and then not disclosing those sales;

fundamentally, this is an omission claim”).

RPM argues that the SEC has not alleged acts undertaken to perpetrate the scheme separate

from the alleged misrepresentations or omissions. RPM Mem. at 42–43. But, the SEC sets forth

a narrative in which Moore engaged in acts to prevent the public from knowing anything about the

*qui tam* complaint or DOJ investigation that went beyond his alleged involvement in the actual

filing of false or misleading statements with the SEC. Although the misrepresentations and

omissions were part of that conduct, they were not the entirety of it. Specifically, the complaint

alleges that RPM and Moore were in possession of a copy of the *qui tam* complaint, yet failed to

disclose it to RPM's audit firm or its Audit Committee. Compl. ¶¶ 29, 31–32. Further, Moore withheld information regarding the potential liability that RPM faced in the DOJ investigation by not disclosing to the Audit Committee on October 2, 2012 that the company had determined Tremco overcharged the government by at least $11.4 million. *Id.* ¶ 34. By December 21, 2012, Moore understood this overcharge estimate had increased to approximately $27–28 million, yet he continued to withhold this information from RPM's auditors and its Audit Committee. *Id.* ¶¶ 50–51, 53. The SEC further claims that during this time, Moore knew that "RPM was working on additional overcharge calculations" so he knew that the "total overcharge amount likely would continue to rise." *Id.* ¶ 48. As of January 8, 2013, when RPM made its second quarter filings with the SEC, Moore had still only told RPM's audit firm that the range of loss for the DOJ investigation was $5 million. *See id.* ¶ 60.

Therefore, the agency has stated a claim under Section 17(a)(3), and defendants' motions to dismiss Claim 2 will be denied.

## III.    The SEC has stated a claim against RPM under Section 13(a) and the Exchange Act Rules in Claim 3.

Claim 3 alleges that RPM violated Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13. Section 13(a) requires issuers of registered securities to file with the SEC any annual reports, quarterly reports, or information and documents that the SEC may require. *See* 15 U.S.C. § 78m(a). Rules 13a-1, 13a-11, and 13a-13 implement the requirements in Section 13(a), and command issuers of registered securities to file annual (Form 10-K), current (Form 8-K), and quarterly (Form 10-Q) reports. *See* 17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13. These reporting requirements are only satisfied by the "filing of complete, accurate, and timely reports." *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), quoting *SEC v. IMC Int'l, Inc.*, 384 F. Supp. 889, 893 (N.D. Tex. 1974). Rule 12b-20 adds the related obligation that

"[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the requirement statements, in the light of the circumstances under which they are made[,] not misleading." 17 C.F.R. § 240.12b-20; *see SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 70–71 (D.C. Cir. 1980) (concluding that statements in Forms 8-K and 10-K violated Rule 12b-20, and therefore, Section 13(a), because the filings made statements about a default but did not disclose that the defendant's prepayment of bank loans had led the insurance lenders to declare a default).

RPM's sole argument to dismiss this claim is that any alleged misrepresentations within its SEC filings were immaterial as a matter of law. RPM Mem. at 35. Since the Court has already determined that the SEC has plausibly alleged that RPM filed materially false and misleading statements with the SEC, the SEC has stated a claim under Section 13(a) that the company's reports were inaccurate, and RPM's motion to dismiss Claim 3 will be denied.

## IV. The SEC has stated a claim against RPM under Section 13(b)(2)(A) of the Exchange Act in Claim 4.

Section 13(b) governs a company's bookkeeping, and Section 13(b)(2)(A) specifically requires every issuer of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). This provision has three primary objectives:

> (1) books and records should reflect transactions in conformity with accepted methods of reporting economic events, (2) misrepresentations, concealment, falsification, circumvention, and other deliberate acts resulting in inaccurate financial books and records are unlawful, and (3) transactions should be properly reflected on books and records in such a manner as to permit the preparation of financial statements in conformity with [generally accepted accounting principles] and other criteria applicable to such statements.

*SEC v. e-Smart Tech., Inc.*, 82 F. Supp. 3d 97, 108 (D.D.C. 2015), quoting *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 748 (N.D. Ga. 1983). Courts in this district have held that

"financial statements are books and records under the securities laws." *See, e.g.*, *Crop Growers Corp.*, 954 F. Supp. at 335, 357 ("[C]ommon sense reading of the statute suggests that financial statements and records are not sufficiently distinct to warrant differential treatment"); *e-Smart Tech.*, 82 F. Supp.3d at 108–09 (referencing the company's Form 10-K and concluding that the "scheme necessarily distorted e-Smart's books" because there was no way that its "books and records . . . 'accurately and fairly' reflected the nature of e-Smart's transactions or the disposition of its assets"); *see also* 15 U.S.C. § 78(c)(a)(37) (defining "records" as "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language").

According to the complaint, RPM's financial statements for the first three quarters of fiscal year 2013 were not accurate because the financial statements for the first two quarters did not disclose the DOJ investigation or accrue for it, and the third quarter financial statement understated the amount to be accrued. Compl. ¶¶ 38, 56, 65, 81. Further, the SEC alleges that the financial statements filed in July 2013 and December 2013 were also inaccurate since they misleadingly implied that RPM had disclosed and accrued for the DOJ investigation in a timely and accurate manner, and stated that the company's internal controls were effective. *See id.* ¶¶ 69, 72.

Other than its assertion that its financial statements were not false, RPM does not appear to make any other arguments relating to Claim 4. *See* RPM Mem. at 35. As discussed in detail above, the Court has concluded that the SEC has sufficiently alleged that the financial statements contained false and misleading statements, and that disclosure and accrual were not made at the appropriate time. Because the alleged inaccuracies in the SEC filings are sufficient to state a claim under Section 13(b)(2)(A) that RPM's records did not "accurately and fairly reflect" the

company's "transactions and dispositions of assets," the Court will deny RPM's motion to dismiss Claim 4.

## V.     The SEC has stated a claim against RPM under Section 13(b)(2)(B) of the Exchange Act in Claim 5.

Turning to Section 13(b)(2)(B), the statute requires issuers to "devise and maintain a system of internal accounting controls."  15 U.S.C. § 78m(b)(2)(B).  More specifically, issuers must have internal accounting controls that provide "reasonable assurances" that:

> (1) transactions are executed in accordance with management's general or specific authorization;
>
> (2) transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
>
> (3) access to assets is permitted only in accordance with management's general or specific authorization; and
>
> (4) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

15 U.S.C. § 78m(b)(2)(B)(i)–(iv).  A "reasonable" degree of assurance is one that "would satisfy prudent officials in the conduct of their own affairs."  15 U.S.C. § 78m(b)(7).  Some examples of internal controls include "manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors."  *McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006); *see e-Smart Tech.*, 82 F. Supp. 3d at 109–110 (finding sufficient evidence of a lack of "virtually any internal accounting controls" to grant summary judgment in favor of the SEC where some of the admitted internal weaknesses included "poor communication among staff and outside consultants" that led to "significant inaccurate information," and a lack of higher-level supervisory review of the accounting process).

In its complaint, the SEC alleges that RPM's internal controls regarding financial reporting had material weaknesses, and that RPM admitted as much in its August 2014 restatement. *See* Compl. ¶¶ 4, 82. Specifically, the SEC refers to a number of occasions where individuals "with GAAP expertise" failed to receive timely and accurate information about the DOJ investigation, and that consequently, the company's financial statements were not prepared in conformity with GAAP as required by the statute. *See* Pl.'s Opp. at 52; Compl. ¶¶ 34, 53, 61, 63. In essence, the complaint paints the picture that Moore and a few other RPM personnel possessed all of the material information regarding the investigation, and that there were insufficient internal checks on their authority and discretion when it came to disclosing or making judgments based on that information.

Again, the only argument RPM appears to make in its motion to dismiss as to Claim 5 is that its financial statements were not false. RPM's Mem. at 35. The Court has already determined that the SEC has plausibly alleged that RPM's statements were false and misleading. And separately, the Court concludes that the SEC's allegations about RPM's lack of internal controls are sufficient to state a claim under Section 13(b)(2)(B). Therefore, RPM's motion to dismiss Claim 5 will be denied.

## VI. The SEC has stated a claim against Moore under Exchange Act Rule 13b2-1 in Claim 6.

In Claim 6, the SEC alleges that Moore violated Rule 13b2-1, which provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A)." 17 C.F.R. § 240.13b2-1. Proof of scienter is not required. *See, e.g.*, *SEC v. Das*, 723 F.3d 943, 954 (8th Cir. 2013); *McConville*, 465 F.3d at 789; *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). The referenced Section 13(b)(2)(A), discussed above, covers a company's financial statements. *See Crop Growers Corp.*, 954 F. Supp. at 357.

Moore deals with this Claim only briefly, arguing that he did not violate Rule 13b2-1 because the SEC has not demonstrated that he acted unreasonably by not disclosing or accruing for a loss contingency under ASC 450. Moore Mem. at 35. However, given the Court's conclusion that the SEC has plausibly alleged that defendants had a duty to disclose or accrue for the DOJ investigation pursuant to ASC 450, Moore's argument is unpersuasive. Moreover, considering Moore's alleged role in communicating with RPM's outside audit firm throughout the time period during which he was responsible for RPM's responses to the DOJ investigation, *see* Compl. ¶¶ 32, 51, as well as his alleged involvement in, and approval of, the reports filed with the SEC, *see id.* ¶¶ 36, 42, 54, 65, 72, the agency has sufficiently alleged that Moore indirectly or directly caused RPM's records to be falsified.

Therefore, defendant Moore's motion to dismiss Claim 6 will be denied.

## VII. The SEC has stated a claim against Moore under Exchange Act Rule 13b2-2(a) in Claim 7.

Claim 7 alleges that Moore violated Rule 13b2-2(a), which provides: "No director or officer of an issuer shall, directly or indirectly . . . make or cause to be made a materially false or misleading statement to an accountant in connection with . . . [a]ny audit, review or examination of the financial statements of the issue." 17 C.F.R. § 240.13b2-2(a). Proof of scienter is also not required under this Rule. *See, e.g.*, *Das*, 723 F.3d at 955; *McConville*, 465 F.3d at 789; *McNulty*, 137 F.3d at 741.

Moore only briefly addresses this Claim, arguing that the SEC has not established that he "unreasonably withheld information from or otherwise misled" RPM's audit firm since RPM's outside counsel was "in possession of the same information" that Moore had, and that the law firm had advised the audit firm that it "did not consider the DOJ investigation to be a disclosable loss contingency." Moore Mem. at 35. But the law firm's alleged failings are not relevant to whether

the SEC has alleged that Moore engaged in misleading conduct of his own. The SEC alleges that Moore himself made statements in management representation letters to RPM's outside audit firm that were materially false or misleading in that they represented that Moore had not dealt with any loss contingencies over $1.2 million despite his knowledge of the DOJ investigation and RPM's potential liability for at least $11 million. *See* Compl. ¶¶ 32, 51. Further, the SEC claims that Moore made other false or misleading statements in person to the auditors, such as when Moore told the audit firm that "no claim ha[d] been asserted," "no claim ha[d] been filed," and that the matter was "investigative in nature and not in litigation," despite knowing that a *qui tam* complaint had been filed. *Id.* ¶¶ 31, 52; *see also id.* ¶¶ 67–68, 76–77.

Taking the alleged facts as true, the SEC has sufficiently pled that Moore acted unreasonably in his communications with the auditors, and therefore violated Rule 13b2-2(a), so Moore's motion to dismiss Claim 7 will be denied.

## CONCLUSION

For all of the foregoing reasons, the Court will deny defendants' motions to dismiss in their entirety.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: September 29, 2017

52