**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 16-1803 (ABJ) |
| RPM INTERNATIONAL, INC. and EDWARD W. MOORE, | |
| Defendants. | |

**SEC'S REPLY IN SUPPORT OF ITS MOTION**
**TO COMPEL PRODUCTION OF INTERVIEW MEMORANDA**
**FROM RPM'S AUDIT COMMITTEE INVESTIGATION**

**Table of Contents**

I.      INTRODUCTION ........................................................................................................1

II.     ARGUMENT ..............................................................................................................2

     A.      RPM misstates the facts about the SEC's agreement with
           Sozio and when the SEC obtained certain evidence.................................2

          1.      The SEC's agreement with Sozio related to one oral
                briefing to the staff and has no bearing on the SEC's
                motion to compel. ..............................................................................2

          2.      The SEC's motion to compel relies on the deposition
                testimony of Carlson, which the SEC did not have at
                the start of discovery. ........................................................................4

     B.      RPM concedes that the interview memoranda are relevant and
           proportional to the needs of this case.....................................................5

     C.      RPM has not shown that the interview memoranda are
           protected work product, much less entirely opinion work
           product. ....................................................................................................6

          1.      RPM has not shown that the interview memoranda
                were prepared in anticipation of litigation. ......................................6

          2.      The D.C. Circuit has rejected RPM's blanket assertion
                that interview memoranda are entirely opinion work
                product. ..............................................................................................8

          3.      RPM's position underscores why *in camera* review is
                appropriate. ......................................................................................10

     D.      RPM waived any attorney-client or work product privilege
           over the interview memoranda................................................................11

          1.      Substantial need is not required where a party has
                waived work product protection. ......................................................11

          2.      RPM waived privilege when the contents of witness
                interviews were disclosed to the SEC because RPM
                disclosed specific communications, not just facts. ...................................12

          3.      RPM waived privilege by putting the findings of the
                Audit Committee investigation at issue. ..........................................16

a)       RPM directly stated the findings of the Audit Committee investigation. ...........................................................17

b)       RPM sought to dismiss the SEC's Complaint based in part on the Audit Committee's findings. ...................................18

E.     The scope of RPM's privilege waiver should include all the interview memoranda from the Audit Committee investigation. ...............................................................................20

F.     Allowing RPM now to claw back the documents that effected a privilege waiver would be unfair to the SEC. ...................................................21

III.    CONCLUSION ...............................................................................23

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this reply in support of its motion to compel the production of interview memoranda from RPM's Audit Committee investigation.[1]

## I.   INTRODUCTION

RPM's opposition illustrates why the SEC's motion to compel should be granted.  This is not a scenario where privileged documents inadvertently were produced.  Instead, RPM knowingly allowed the documents and information at issue to be provided to the SEC.  The consequence of RPM's choice is the waiver of attorney-client and work product protection.

The SEC's motion to compel relied heavily on (i) three Ernst & Young LLP ("EY") documents that disclosed the contents of witness interviews from RPM's Audit Committee investigation, and (ii) the deposition testimony of EY's Mark Carlson, who drafted the documents and interacted with Jones Day during the Audit Committee investigation.  RPM's opposition confirms that Jones Day "was in regular contact" with Carlson during the investigation, and "disclosed to [Carlson] certain facts obtained in witness interviews."  Sozio Decl. ¶ 7 (ECF No. 73-22).  Further, Stephen Sozio, the Jones Day lawyer who led the Audit Committee investigation and communicated with Carlson, does *not* dispute the accuracy of the three documents that Carlson drafted or the substance of Carlson's deposition testimony.  *See id*. ¶¶ 1-10.  And RPM's opposition confirms that RPM conducted a privilege review of the three EY documents before they were produced to the SEC.  *See* RPM Opp'n at 13-14.

Against that backdrop, the arguments in RPM's opposition fail.  RPM has not shown that the interview memoranda from the Audit Committee investigation were prepared in anticipation

---

[1]    This reply refers to the SEC's opening brief as "SEC Mem." (ECF No. 71-1), and to RPM's opposition brief as "RPM Opp'n" (ECF No. 73).

of litigation.  But even if RPM made that showing, it waived any work product or attorney-client privilege over the memoranda by, among other things, allowing specific communications from the witness interviews to be disclosed to the SEC.

In arguing that no waiver occurred, RPM conspicuously ignores both the specific communications that it disclosed and the specific case law cited by the SEC showing that such disclosures result in a waiver of privilege over the interview memoranda.  Accordingly, for these and the other reasons set forth more fully below, the SEC's motion to compel should be granted.

## II.    ARGUMENT

### A.    RPM misstates the facts about the SEC's agreement with Sozio and when the SEC obtained certain evidence.

Throughout its opposition, RPM repeats two assertions:  (1) that the SEC supposedly "agreed in writing" to forego the waiver arguments in its motion to compel, *see, e.g.*, RPM Opp'n at 2; and (2) that "[f]rom day one of the discovery period, the SEC had *all* of the information and documents upon which it now relies to assert a waiver," *id*. at 3 (emphasis in original).  Both assertions are wrong.

#### 1.    The SEC's agreement with Sozio related to one oral briefing to the staff and has no bearing on the SEC's motion to compel.

RPM repeatedly highlights the SEC staff's agreement not to assert a waiver based on a specific oral briefing from Sozio to the staff on August 21, 2014, and claims that such agreement forecloses the waiver arguments in the SEC's motion to compel.  *See id*. at 2, 11-12, 37-40.  RPM also claims that the SEC "did not mention [Sozio's] briefing or the non-waiver agreement" to the Court.  *Id*. at 12; *see also id*. at 37 (claiming the SEC "omits" to mention this information).  But the staff's agreement with Sozio has no bearing on the SEC's motion to compel, and the SEC publicly filed its agreement with Sozio months ago.

By its plain terms, the SEC staff's agreement with Sozio related only to one oral briefing from Jones Day to the SEC.  The SEC arranged a call with Sozio on "August 21, [2014,] to discuss the recent investigation that Jones Day conducted on behalf of RPM's Audit Committee."  Sozio Decl., Ex. B (ECF No. 73-22).  In connection with that call, the SEC staff stated (1) that it was "not requesting" the disclosure of "materials or communications relating to the investigation that are subject to attorney-client privilege or work product protection," and (2) that the "staff will not assert that *your oral briefing to us* about the Investigation's findings constitutes a waiver of the attorney-client privilege or work product protection."  *Id*. (emphasis added).  Thus, the non-waiver agreement expressly was limited to "[Sozio's] oral briefing to [the staff]" on August 21, 2014.  Indeed, in his declaration, Sozio confirms the limited scope of the agreement, stating that the staff "agreed it would not argue that *my oral briefing to them* would constitute a waiver."  Sozio Decl. ¶ 8 (ECF No. 73-22) (emphasis added).

The SEC staff honored its agreement.  The SEC never argued – in its motion to compel or any other filing – that Sozio's oral briefing to staff on August 21, 2014 effected any waiver of privilege.  The SEC's motion to compel is *not* based on Sozio's oral briefing to the staff, but on *other* disclosures that were not subject to any non-waiver agreement, including RPM/Jones Day disclosing information to EY and then RPM allowing certain EY documents to be produced to the SEC.  *See* SEC Mem. at 4-12, 17-26.  As such, the staff's agreement with Sozio has no bearing on the SEC's motion to compel.[2]

---

[2]     Sozio states that, in his call with the staff on August 21, 2014, he "did not disclose any information subject to the attorney-client privilege or attorney's work product doctrine."  Sozio Decl. ¶ 8 (ECF No. 73-22).  The SEC agrees.  For example, Sozio did not tell the SEC about the specific statements made by Moore during his interview and memorialized in EY's memoranda and notes.  Instead, that information was shared with EY and later produced to the SEC after RPM's privilege review.  Thus, as noted above, the SEC's motion to compel does *not* assert waiver based on Sozio's oral briefing to the staff but on other RPM disclosures.

Additionally, RPM's claim that the SEC staff hid its agreement with Sozio is false.  In fact, the SEC filed the agreement with the Court on March 5, 2019, about *four months before* the SEC filed its motion to compel.  *See* ECF No. 63-6 at RPM-SEC_1095894 (E-mail from SEC staff to Sozio, Aug. 19, 2014); *see also* ECF No. 63 at 7 n. 5 (SEC brief discussing staff's Aug. 19, 2014 e-mail to Sozio).  In sum, the staff's agreement with Sozio, which the SEC previously disclosed, is irrelevant to the pending motion to compel.

> **2.    The SEC's motion to compel relies on the deposition testimony of Carlson, which the SEC did not have at the start of discovery.**

RPM also asserts that, from the start of discovery, "the SEC had *all* of the information and documents upon which it now relies to assert a waiver."  RPM Opp'n at 3 (emphasis in original).  That assertion is incorrect because the SEC did not have the deposition testimony of EY's Mark Carlson until well into discovery.

As RPM notes, discovery began on January 2, 2018.  *Id*. at 15.  The SEC's motion to compel cites extensively to the deposition of Carlson, *see* SEC Mem. at 4-10, 20, and that deposition took place months into discovery on December 5, 2018, *see* SEC Mem., Ex. 5 at 1 (cover page of Carlson Dep. Tr.) (ECF No. 71-7).  Soon after receiving the deposition transcript, the SEC began preparing its motion to compel but, due to a lapse in appropriations, the SEC was shut down from December 27, 2018, until January 28, 2019.  Promptly after the SEC reopened,

the SEC's counsel met and conferred with defense counsel and then, on February 19, 2019, requested leave of Court to file its motion to compel.  *See* Minute Entry (Feb. 19, 2019).[3]

In all events, the SEC did not have Carlson's deposition testimony at the outset of discovery and, promptly after taking that deposition, the SEC advanced its motion to compel.

**B.     RPM concedes that the interview memoranda are relevant and proportional to the needs of this case.**

A party may obtain discovery of information that is (i) "relevant," (ii) "proportional to the needs of the case," and (iii) not privileged.  Fed. R. Civ. P. 26(b)(1).  Information or documents "need not be admissible in evidence to be discoverable."  *Id.*

In its opening brief, the SEC showed that the interview memoranda from RPM's Audit Committee investigation are both relevant and proportional to the needs of this case.  *See* SEC Mem. at 15-17.  In its opposition, RPM does not address or refute those arguments, so RPM concedes relevance and proportionality.  *See Bravata v. SEC*, Civil Action No. 14-1276 (TSC), 2015 WL 4077446, at *4 (D.D.C. July 6, 2015) (where party fails to address argument in opposition brief, "the Court treats the matter as conceded").  Thus, the only issue in dispute is whether the interview memoranda are protected by the attorney-client or work product privileges.  They are not.

---

[3]     When the parties spoke with the Court in February 2019, the SEC sought to file its motion to compel at that time.  But RPM asserted the meritless argument that it did not have control over the Jones Day interview memoranda.  As a result, the Court directed the parties to brief the issue of control before addressing the issue of waiver.  *See* Minute Order (Feb. 19, 2019).  RPM's control argument was shown to be baseless because, after the Court ruled that RPM had the practical ability to obtain the memoranda (*see* Tr. of Tel. Hr'g, May 16, 2019, at 5:25 – 6:3, 8:23 – 9:2, 13:8 – 13:10), RPM in fact obtained the memoranda and produced them, albeit with all the witness statements redacted.  *See* SEC Mem., Ex. 4 (ECF No. 71-6).

**C.      RPM has not shown that the interview memoranda are protected work product, much less entirely opinion work product.**

Although RPM thus far has refused to submit the interview memoranda for *in camera* review, RPM asserts that the memoranda are "opinion work product in their entirety."  RPM Opp'n at 3, 24-25.  RPM's overbroad position is inconsistent with the facts and relevant precedent, and it underscores why *in camera* review is appropriate.

**1.      RPM has not shown that the interview memoranda were prepared in anticipation of litigation.**

A document is entitled to work product protection if it was "prepared in anticipation of litigation."  Fed. R. Civ. P. 26(b)(3)(A).  The SEC agrees with RPM on the legal test for work product protection, *see* RPM Opp'n at 21-22, but RPM fails the test.

In determining whether a document was prepared in anticipation of litigation, the D.C. Circuit asks whether the document was "prepared or obtained because of the prospect of litigation."  *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 251 (D.C. Cir. 2016) (citation omitted).  "For that standard to be met, the attorney who created the document must have 'had a subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'"  *Id*. (citation omitted).  But "[w]here a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available."  *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (citation omitted).

Here, RPM has not shown that the interview memoranda were prepared in anticipation of litigation.  Instead, RPM's own admissions show that the Audit Committee investigation was conducted to assuage the concerns of RPM's auditors at EY – *not* because of any litigation – and Sozio's declaration does not compel a different conclusion.

For example, in *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64 (D.D.C. 2017), the defendant submitted a declaration from its counsel stating that, during an internal investigation, "she 'was aware of the possibility of litigation' and that the [interview] memoranda [from the investigation] 'were intended to be internal work product for use by the Cadwalader legal team.'"  *Id*. at 73.  Nevertheless, the court found that the interview memoranda were *not* prepared in anticipation of litigation because the defendant's own statements "d[id] not indicate that the investigation was conducted as a result of anticipated litigation" but rather to decide whether to change the board's standards of conduct.  *Id*.

In his declaration, Sozio offers one conclusory sentence about whether litigation was anticipated:  "Each of the draft interview memoranda constitutes attorney's work product of Jones Day, because, at least by July 2014, litigation or other enforcement proceedings by the SEC (as well as other potential legal actions) were reasonably foreseeable."  Sozio Decl. ¶ 4 (ECF No. 73-22).  But that sentence is materially indistinguishable from counsel's statement in *Banneker Ventures* (that she was "aware of the possibility of litigation"), and it does not contradict RPM's own admissions that the Audit Committee investigation was conducted to address EY's concerns – which had nothing to do with any litigation.

In October 2014, two years before RPM was sued, William Summers, the Chair of RPM's Audit Committee, testified that Jones Day was hired to conduct the Audit Committee investigation because EY suggested "they were not going to sign [RPM's Form 10-K] in the absence of a special investigation."  RPM Opp'n, Ex. J (Summers Inv. Tr.) at 165:20 – 165:23; *see also id*. at 166:12 – 166:25 (ECF No. 73-9).  Therefore, Summers explained, RPM's "assignment to Jones Day was to conduct a thorough investigation based on the . . . scope that EY felt was necessary to get them to a comfort level where they would be able to sign the [10-]K

. . . . [C]learly, we wanted to be able to address EY's concerns." *Id*. at 179:21 – 180:6.  Even

now, after being sued, RPM confirms that Jones Day was hired because EY indicated it would

not sign RPM's Form 10-K without an independent investigation.  *See* RPM Opp'n at 8.  And

nothing in Sozio's declaration is to the contrary.  *See* ECF No. 73-22.  Accordingly, because

RPM needed to address EY's concerns and file its Form 10-K "regardless of [any] litigation,

work product protection is not available."  *Boehringer*, 778 F.3d at 149.

> ### 2.    The D.C. Circuit has rejected RPM's blanket assertion that interview memoranda are entirely opinion work product.

Even if the interview memoranda were prepared in anticipation of litigation, RPM asserts

– without any *in camera* review – that the memoranda are "opinion work product in their

entirety."  RPM Opp'n at 3; *see also id*. at 24-25 (same).  RPM's suggestion that the interview

memoranda are *per se* entirely opinion work product has been rejected by the D.C. Circuit.

In *Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304 (D.C.

Cir. 1997), the D.C. Circuit rejected the argument "that a lawyer's interview notes are *always*

opinion work product" because "this proposition goes too far."  *Id*. at 1307-08 (emphasis in

original); *see also United States v. AB Electrolux*, Civil Action No. 15-1039 (EGS), 2015 WL

9950141, at *5 (D.D.C. Sept. 25, 2015) ("The D.C. Circuit has rejected the argument that a

lawyer's notes are *always* work product as a proposition that 'goes too far.'") (emphasis in

original; citation omitted).

Contrary to RPM's suggestion, there is no *per se* rule that interview memoranda

constitute opinion work product.  Instead, whether interview memoranda contain fact or opinion

work product "is inherently and necessarily fact-specific," and depends on whether they contain

"non-privileged facts" (fact work product) or the attorney's "mental impressions, conclusions,

opinions, or legal theories" (opinion work product).  *United States v. Clemens*, 793 F. Supp. 2d

236, 253 (D.D.C. 2011) (citations omitted).

In *Clemens*, for example, DLA Piper conducted an internal investigation, interviewed

witnesses, and prepared interview memoranda.  *See id*. at 242.  The memoranda did not contain a

verbatim recitation of every word the witnesses said; "only those matters that [the lawyers]

'deemed to be material' were reflected in the memorand[a]."  *Id*.  Nevertheless, after an *in

camera* review, *id*. at 239, the court found that the interview memoranda at issue "constitute[d]

'fact' work product."  *Id*. at 253-54.  The court concluded the memoranda were fact work

product because they "accurately depict[ed]" what the witnesses said rather than "mental

impressions, thought processes, legal strategy, or personal assessments" of the law firm.  *Id*. at

254; *see also In re Symbol Techs., Inc. Sec. Litig.*, No. CV 05-3923 (DRH) (AKT), 2017 WL

1233842, at *19 (E.D.N.Y. Mar. 31, 2017) (concluding after *in camera* review that interview

memoranda were fact work product because they contained "a factual summary" but did not

"divulge the mental impressions, conclusions, legal theories or opinions of Plaintiff's counsel").[4]

Here, based on the documents that EY produced describing the interviews, it seems likely

that the interview memoranda, at least in part, memorialize facts and not the mental impressions

---

[4]      The cases cited by RPM, *see* RPM Opp'n at 23-25, do not support the proposition that
interview memoranda necessarily are opinion work product in their entirety.  For example, in
*United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419 (D.D.C. 2014), the court
cited *Clemens* with approval and explained that "witness statements contained in interview
memoranda that have not been 'sharply focused or weeded' by an attorney [are] 'fact' rather than
'opinion' work-product."  *Landis*, 303 F.R.D. at 425.  In *Frank LLP v. CFPB*, 288 F. Supp. 3d
46 (D.D.C. 2017), a FOIA case, the court noted the "distinction between 'opinion' and 'fact'
work product" but did not decide which category the interview notes fell into because "there is
no such fact-opinion distinction for purposes of [FOIA] Exemption 5."  *Id*. at 54.  And in
*Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 168 F.R.D. 445 (D.D.C. 1996),
the district court stated that interview notes "are properly treated as opinion work product."  *Id*.
at 447.  But on appeal, the D.C. Circuit held that the district court's ruling that "interview notes
are *always* opinion work product . . . goes too far."  124 F.3d at 1307-08 (emphasis in original).

or legal theories of RPM's counsel.  In any event, relevant precedent indicates that the Court should not simply accept RPM's assertion that the memoranda are entirely opinion work product.

### 3.   RPM's position underscores why *in camera* review is appropriate.

During the pre-motion conference with the Court on July 2, 2019, although no transcript was prepared, the SEC understood the Court to indicate that *in camera* review of the interview memoranda would be appropriate.  In its opening brief, the SEC presented legal and factual reasons supporting the need for *in camera* review.  *See* SEC Mem. at 26-28.  RPM's opposition fails to address *in camera* review, but its arguments illustrate why such review is needed here.

In *Gruss v. Zwirn*, 296 F.R.D. 224 (S.D.N.Y. 2013), Gibson Dunn conducted an internal investigation and then, in a discovery dispute, resisted *in camera* review of its interview notes, claiming – like RPM – that "the interview notes constitute, in their entirety, core opinion work product."  *Id*. at 230.  The court, however, ordered *in camera* review, explaining that it was "not required to accept" Gibson Dunn's assertion that the notes were entirely opinion work product and that "*[i]n camera* review is 'a practice both long-standing and routine in cases involving claims of privilege.'"  *Id*. at 231 (citation omitted).  Further, the court found the suggestion that "every word in the interview memos constitutes 'core opinion work product' is *not credible*."  *Id*. (emphasis added; citation omitted).  The *Gruss* court's approach to *in camera* review is entirely consistent with D.C. Circuit precedent, including cases cited by RPM.  *See, e.g., NACDL*, 844 F.3d at 252 (court conducted *in camera* review to determine whether documents were protected work product); *United States v. Deloitte LLP*, 610 F.3d 129, 133 (D.C. Cir. 2010) (remanding "for *in camera* review to determine whether [document] is entirely work product"); *see also Clemens*, 793 F. Supp. 2d at 239 (court conducted *in camera* review of interview documents).

Here, as in *Gruss*, RPM's assertion that the interview memoranda are "opinion work product in their entirety," RPM Opp'n at 3, 24-25, is simply "not credible."  296 F.R.D. at 231.

Thus, the Court should review the interview memoranda *in camera* to redact any mental

impressions or legal theories of counsel (to the extent the memoranda contain any), while

allowing the SEC to discover the factual information in the memoranda.

**D.      RPM waived any attorney-client or work product privilege over the
         interview memoranda.**

Even if RPM carries its burden to show that the interview memoranda were protected by

the attorney-client privilege or work product doctrine, RPM waived those protections.[5]

**1.      Substantial need is not required where a party has waived work
         product protection.**

RPM spends two pages of its brief arguing that the SEC cannot show "substantial need"

for the interview memoranda.  *See* RPM Opp'n at 25-26.  But the SEC did not argue substantial

need in its motion to compel because the substantial need requirement of Fed. R. Civ. P.

26(b)(3)(A)(ii) does not apply where, as here, a party has waived any work product protection.

As one of the cases cited by RPM explains, "the 'substantial need' exception has no

applicability where the attorney work-product privilege has already been waived."  *Feld v.*

*Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 254 (D.D.C. 2013).  In other words, "if the work-

---

[5]      While the SEC disputes RPM's showing that the memoranda were prepared in
anticipation of litigation, the SEC does not dispute RPM's position that 16 of the 19 memoranda
(concerning interviews of RPM's employees or counsel) were covered by the attorney-client
privilege, at least before the privilege was waived.  *See* RPM Opp'n at 26-27.  The parties agree
that three of the memoranda – from interviews of (1) Daniel Berick and Julia Tosi of Squire
Patton Boggs (who represented underwriters, not RPM, in a bond offering), (2) Susan Flaherty
and Joseph Lukac of EY, and (3) Lawrence Cruise of EY – were never covered by the attorney-
client privilege.  *See* RPM Opp'n, Ex. K (memoranda nos. 6, 14, and 19) (ECF No. 73-10).  But
that distinction does not matter here because, through disclosures to the SEC and other actions in
this litigation, RPM waived *both* the attorney-client and work product privileges.  *See In re*
*Subpoenas Duces Tecum*, 738 F.2d 1367, 1369-75 (D.C. Cir. 1984) (disclosure to SEC waived
attorney-client and work product protections); *Wichita Land & Cattle Co. v. Am. Fed. Bank*, 148
F.R.D. 456, 461 (D.D.C. 1992) ("where disclosure to an adversary in litigation constitutes a
waiver of attorney-client privilege, it also effects a waiver of the work product rule").

product protection has been waived, the moving party is entitled to discovery of such work

product, even without showing substantial need."  *Id.*; *see also id.* at 255-56 (holding that party

waived work product protection by putting work product at issue, and that the "Court's waiver

holding extends both to fact work product and opinion work product").  So, in light of RPM's

waiver, its discussion of substantial need is irrelevant.

> **2.      RPM waived privilege when the contents of witness interviews were disclosed to the SEC because RPM disclosed specific communications, not just facts.**

In its opening brief, the SEC highlighted specific communications from witness

interviews that RPM disclosed to the SEC (*see* SEC Mem. at 6, 8-9), and specific cases showing

that disclosing the substance of witness interviews to the SEC waives privilege over the

interview memoranda (*see id.* at 19).  In its opposition, RPM conspicuously fails to address the

communications and case law put forth by the SEC.  The reason is obvious:  the communications

and case law demonstrate that RPM waived privilege.

RPM argues that communications are privileged while facts are not.  *See* RPM Opp'n at

28-30.  Assuming that distinction is correct, it does not help RPM because, after conducting a

privilege review, RPM allowed EY to disclose specific communications from witness interviews.

For example, EY's August 13, 2014 memorandum described communications from the

interviews of Edward Moore (RPM's General Counsel), Rusty Gordon (RPM's Chief Financial

Officer), and Ron Rice (RPM's Chief Operating Officer):

- "***Ed Moore said he knew*** the amount [of RPM's potential liability] had increased above $11 million."  SEC Mem., Ex. 8 at EY-RPM-EWP-002738 (ECF No. 71-10) (emphasis added).

- "***In his interview, Ed Moore took responsibility for his failure*** to communicate updated information.  ***He stated in hindsight that he should have informed stakeholders*** including those responsible for financial reporting, EY and the Audit Committee.  ***He conceded that he was aware*** the Company was working on an

offer of settlement with the DOJ and that the estimate had grown to an amount greater than $10 million." *Id*. at EY-RPM-EWP-002739 (emphasis added).

- "***Rusty Gordon stated*** he relied on Ed Moore to provide him with information in a timely manner." *Id*. (emphasis added).

- "***In his interview, [Rice] stated*** he did not believe the analysis was correct at the time and more work and analysis needed to be completed," but "[h]e was not aware of details of analysis or status of GSA Matter beyond the 1st Quarter 2013." *Id*. at EY-RPM-EWP-002740 (emphasis added).

EY's August 10, 2014 memorandum also described communications from the interviews

of Moore, Gordon, Keith Smiley (RPM's Controller), and Frank Sullivan (RPM's Chief

Executive Officer):

- Moore said, "***I did not intend to mislead [the Audit Committee] or EY***," but "***I should have said something***." SEC Mem., Ex. 7 at EY-RPM-MCAR-000036 (ECF No. 71-9) (emphasis added).

- "***Rusty, Keith, Frank say [they] did not know***" about RPM's increased exposure. *Id*. (emphasis added).

- "***Rusty, said, I kind of relied on Ed***." *Id*. at EY-RPM-MCAR-000037 (emphasis added).

Carlson's notes also disclosed additional communications from Moore's interview:

- On page 16 of his notes (SEC Mem., Ex. 9 at EY-RPM-MCAR-000016 (ECF No. 71-11)), under the notation "Ed," Carlson wrote down portions of what Moore said during his interview with Jones Day. *See* SEC Mem., Ex. 5 (Carlson Dep.) at 196:5 – 197:9 (ECF No. 71-7).

- Carlson's notes refer to a telephone call on "12/21." SEC Mem., Ex. 9 at EY-RPM-MCAR-000016 (ECF No. 71-11). Carlson explained that his notes referred to a call on December 21, 2012, and, "***during [his] interview, Ed Moore said*** – what I heard was it wasn't 11 [million]. There's five [million] here. There's five [million] there." SEC Mem., Ex. 5 (Carlson Dep.) at 200:16 – 202:3 (ECF No. 71-7) (emphasis added).

- Carlson's notes also state, "Never do again w/o RPM finance person on what numbers mean." SEC Mem., Ex. 9 at EY-RPM-MCAR-000016 (ECF No. 71-11). Carlson explained that, "***based on my discussions with Jones Day*** and what was said in the interviews in trying to understand the situation, ***they told me that in the interview, Ed said I'd never do it again without RPM finance people***

*involved*."  SEC Mem., Ex. 5 (Carlson Dep.) at 204:18 – 205:17 (ECF No. 71-7) (emphasis added).

RPM argues that the EY documents reflect only "certain facts" – not privileged communications – but, tellingly, RPM does not address *any* of the specific communications from witness interviews highlighted above.  *See* RPM Opp'n at 30-32.  RPM also fails to address the specific cases cited by the SEC, which demonstrate that RPM's disclosures from witness interviews waived privilege.  *Compare* SEC Mem. at 19 (citing cases discussing waiver from disclosing substance of interviews), *with* RPM Opp'n at 28-32 (failing to address cases).

Instead, RPM attempts a sleight of hand, focusing on its disclosure of certain facts that do not bear on the waiver analysis, without addressing the disclosure of specific communications that effected RPM's privilege waiver.  *See* RPM Opp'n at 28-32.[6]  Similarly, RPM emphasizes the "privileged" or "work product" headers on the interview memoranda (*see id*. at 3, 12, 21), which are virtually meaningless to the waiver analysis.  *See Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 62 (D.D.C. 2018) (the "mere act of placing a confidentiality designation on a document cannot possibly inoculate it from waiver").

Likewise, RPM's claim that it did not disclose the interview memoranda themselves, *see* RPM Opp'n at 1, 32-33, cannot prevent a waiver.  That is because "there is little or no

---

[6]     The cases cited by RPM are distinguishable because they involved the disclosure of facts from an investigation, not communications from witness interviews.  For example, in *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521 (S.D.N.Y. 2015), there was no privilege waiver where the company disclosed a report containing the factual results of its investigation but "never shared the [contents of interviews] with any government agency or third party."  *Id*. at 529.  Similarly, in *In re Woolworth Corp. Securities Class Action Litigation*, No. 94 Civ. 2217 (RO), 1996 WL 306576 (S.D.N.Y. June 7, 1996), the company disclosed a report from its investigation that "la[id] out the facts" but did not disclose the "communications between attorney and client" from witness interviews.  *Id*. at *2.  Here, in contrast, as described above, RPM disclosed specific communications between witnesses and attorneys during interviews and those disclosures effected a waiver of privilege.

substantive distinction for waiver purposes between the actual physical delivery of the work product notes and memoranda and reading or orally summarizing" the information contained therein to an adversary.  *SEC v. Herrera*, 324 F.R.D. 258, 260 (S.D. Fla. 2017); *see also United States v. Reyes*, 239 F.R.D. 591, 604 (N.D. Cal. 2006) (where parties waived privilege by oral disclosures, court found "specious" the argument that "the privileges still apply because no written materials were provided to the government").

Nor does it matter that the interview memoranda were typed after RPM/Jones Day disclosed communications from the interviews.  *Cf*. RPM Opp'n at 9, 18, 32-33.  Regardless of when they were prepared, the memoranda reflect the witnesses' communications from the interviews – the same information that was disclosed – and, for waiver purposes, "the transmission of privileged information is what matters, not the medium through which it is conveyed."  *Reyes*, 239 F.R.D. at 604.  A party cannot orally disclose a privileged communication, waive the privilege, and then re-create the privilege simply by writing down the same communication at a later date.  To the contrary, "the general rule is that a one-time disclosure of privileged [information] to an adverse party is sufficient to destroy both the attorney-client privilege and work product protection."  *Gruss v. Zwirn*, No. 09 Civ. 6441 (PGG) (MHD), 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013).

In sum, when RPM reviewed EY's documents and allowed those documents reflecting communications from interviews to be produced to the SEC, that production "waive[d] any work product or attorney-client privilege over any notes or memoranda memorializing those interviews."  *In re Banc of Cal. Sec. Litig.*, No. SA CV 17-00118-AG (DFMx), 2018 WL 2373860, at *1 (C.D. Cal. May 23, 2018); *see also Herrera*, 324 F.R.D. at 264 (by providing oral summaries of witness interviews to the SEC, party "knowingly waived work-product protection

15

in the interview notes and memoranda"); *Gruss*, 2013 WL 3481350, at *13 (by disclosing "[e]xcerpts" of witness interviews to the SEC, "any work product protection associated with the factual portions of the interview notes and summaries was forfeited"); *SEC v. Vitesse Semiconductor Corp.*, No. 10 Civ. 9239 (JSR), 2011 WL 2899082, at *3 (S.D.N.Y. July 14, 2011) (company "waived work product privilege with respect to the [interview] notes by providing very detailed, witness-specific information to the SEC").

        **3.**      **RPM waived privilege by putting the findings of the Audit Committee investigation at issue.**

RPM also effected an at-issue waiver of privilege.  One of the cases cited by RPM, *Feld*, aptly summarized at-issue waiver of work product protection:  "recognizing the attorney work-product privilege 'is *not* required to maintain a healthy adversary system,' when the proponent of the privilege has placed prior attorney work product squarely 'at issue' in the case."  991 F. Supp. 2d at 252 (quoting *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) (emphasis added)).  "Indeed, allowing the privilege to shield documents at the heart of the proponent's case would *undermine* the adversary system, and would let the work-product privilege 'be used as a tool for manipulation of the truth-seeking process.'"  *Feld*, 991 F. Supp. 2d at 252 (citation omitted; emphasis in original); *see also id*. at 252-53 (finding that party "waived the work-product privilege . . . by placing attorney work-product at issue").

The D.C. Circuit illustrated those principles in *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015), and found there was not an at-issue waiver arising from an internal investigation where KBR only mentioned its investigation in a footnote of a brief but made "no *actual* disclosure of . . . the conclusions of the [internal] investigation."  *Id*. at 147 (emphasis in original).  Since KBR "neither directly stated" the findings of the investigation "nor sought any specific relief because of the results of the investigation," no implied waived occurred.  *Id*.  Here,

in contrast, a finding of waiver is appropriate because RPM (1) "directly stated" the findings of the Audit Committee investigation and (2) sought "specific relief" based on those findings.

### a)      RPM directly stated the findings of the Audit Committee investigation.

RPM actually disclosed the findings of the Audit Committee investigation in several documents.  First, in the Form 8-K filed on August 14, 2014, RPM disclosed:  that the Audit Committee "concluded" RPM made "an error in the timing of disclosure and accrual" for the DOJ investigation; that "the Audit Committee . . . determined" specific amounts "should have been accrued" prior to RPM's third quarter of fiscal 2013; and that the "Audit Committee determined that the accounting errors . . . did not result from intentional misconduct" but from a "material weakness" in RPM's internal controls.  SEC Mem., Ex. 1 (ECF No. 71-3).[7]

Second, as memorialized in EY's August 10, 2014 memorandum, RPM (through Jones Day) disclosed the "preliminary findings and conclusions of the Audit Committee based on the work performed by the Investigation Team."  SEC Mem., Ex. 7 (ECF No. 71-9).

Third, as memorialized in EY's August 13, 2014 memorandum, RPM (through Jones Day) disclosed the Audit Committee "Investigation Team's conclusions," including detailed, quarter-by-quarter findings about what RPM employees said, did, and knew (or did not know)

---

[7]      RPM argues that all of the disclosures in its Form 8-K were "mandatory" and "hardly benefited RPM."  RPM Opp'n at 34.  That is an overstatement.  Although a company announcing a restatement in a Form 8-K must disclose "a brief description of the facts underlying the conclusion" to restate, *see* Instructions for Form 8-K at Item 4.02(a)(2), *available at* https://www.sec.gov/files/form8-k.pdf, nothing required RPM to disclose the gratuitous conclusion that its accounting error "did not result from intentional misconduct."  SEC Mem., Ex. 1 (ECF No. 71-3).  Presumably RPM made that unnecessary disclosure for its own benefit, in the hope of dissuading fraud claims by private plaintiffs (or the SEC) under Rule 10b-5, which requires a showing of intent.  *See generally Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019).

during the DOJ investigation.  SEC Mem., Ex. 8 at EY-RPM-EWP-002735 (ECF No. 71-10);
*see also id*. at EY-RPM-EWP-002735 to -002740 (discussing conclusions).

RPM now argues that the Audit Committee's findings actually are set forth in a letter
dated August 14, 2014, from William Summers to EY.  *See* RPM Opp'n at 31 n.15; Sozio Decl.,
Ex. C (ECF No. 73-22).  On its face, however, the letter is not a report of the Audit Committee
investigation's findings; instead, the letter recites that the Audit Committee *previously* "received
satisfactory final reports . . . from Legal Counsel . . . regarding the results of the Investigation."
Sozio Decl., Ex. C at RPM2_005034 ¶ 6 (ECF No. 73-22).  RPM would like this letter to be the
Audit Committee's findings because it contains few details and states again that "[t]he Audit
Committee is not aware of any *intention* of the Company, nor of its executive officers, to violate
the law." *Id*. ¶ 7.e (emphasis added).  But for present purposes, even if Summers's letter
contained the findings of the Audit Committee investigation, it simply confirms that RPM
disclosed those findings, including RPM's purported lack of intent.

> **b)** **RPM sought to dismiss the SEC's Complaint based in part on
> the Audit Committee's findings.**

RPM argues that a defendant must do more than "merely deny a plaintiff's allegations" or
"[m]ention[] an internal investigation" to effect an at-issue waiver.  RPM Opp'n at 35.  But RPM
did not merely deny the SEC's allegations or mention the Audit Committee's investigation – it
emphasized the Audit Committee's findings as a reason to dismiss the SEC's Complaint.

In moving to dismiss the SEC's Complaint, RPM submitted a copy of its Form 8-K dated
August 14, 2014, which disclosed the Audit Committee's findings.  *See* Mem. in Support of
RPM's Mot. to Dismiss., Ex. M (ECF No. 30-14).  Then, quoting from the Form 8-K, RPM
emphasized the importance of the Audit Committee's no-intent finding:

> Importantly, the Audit Committee did not find that intentional misconduct had occurred,
> or that anyone believed at the time that RPM's accounting was false:

> ***The Audit Committee determined that the accounting errors described above did not result from intentional misconduct***.  However, the Company believes that the restatement reflects a material weakness in the Company's internal control over financial reporting . . . .  The Company has concluded that the ***unique factors related to the GSA matter contributed to a break-down in communications*** and resulted in the material weakness.

Mem. in Support of RPM's Mot. to Dismiss at 16-17 (ECF No. 30) (emphasis in original).

Later in the same brief, again quoting the Audit Committee's findings in the Form 8-K, RPM argued that "[a]lthough RPM's restatement acknowledges that 'errors' and a 'break-down in communications' had occurred, it *makes clear* that these errors '*did not result from intentional misconduct*.'"  *Id.* at 29 (emphasis added).

Any fair reading of RPM's motion to dismiss shows that RPM did not merely deny the SEC's allegations or mention the Audit Committee investigation.  Instead, RPM emphasized the alleged "importan[ce]" of the Audit Committee's findings and argued that those finding "make[] clear" RPM's accounting error was not the result of intentional misconduct.  By choosing to rely on the Audit Committee's findings to support its defenses, RPM put those findings at issue and waived privilege over the interview memoranda that contain the factual bases for those findings. *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 471-72 (S.D.N.Y. 1996) (by citing findings from internal investigation in motion to dismiss – to show that company "engaged in no deliberate misbehavior" – company "put in issue the statements made by all interviewees" during investigation); *see also Banneker Ventures*, 253 F. Supp. 3d at 74 (by using internal investigation

findings "to its advantage in this litigation," party waived privilege over interview memoranda from investigation).[8]

In sum, RPM put the conclusions of the Audit Committee investigation "squarely 'at issue' in the case." *Feld*, 991 F. Supp. 2d at 252. At the same time, however, RPM used the work product doctrine to shield the interview memoranda that may support – or contradict – those conclusions. *See* SEC Mem., Ex. 4 (RPM's redaction log and copies of interview memoranda with all witness statements redacted) (ECF No. 71-6). RPM's unfair use of privilege "undermine[s] the adversary system," and supports a finding of at-issue waiver. *Feld*, 991 F. Supp. 2d at 252 (emphasis omitted); *see also Banneker Ventures*, 253 F. Supp. 3d at 74 ("[f]airness dictates" that if party uses investigative findings "to support its claims and defenses," then party's opponent "is entitled to the remaining facts and information contained in the interview memoranda").

**E. The scope of RPM's privilege waiver should include all the interview memoranda from the Audit Committee investigation.**

RPM agrees that the scope of any privilege waiver here is governed by Federal Rule of Evidence 502(a). *See* RPM Opp'n at 38 (discussing "voluntary waiver" and citing Rule 502(a)). Under that Rule, a waiver of attorney-client privilege or work product protection extends to undisclosed information where (1) the waiver is "intentional," (2) the disclosed and undisclosed information concern the "same subject matter," and (3) "they ought in fairness to be considered together." Fed. R. Evid. 502(a).

---

[8]     Again, the cases cited by RPM are distinguishable because the companies in those cases did *not* affirmatively use investigative findings to support their claims or defenses in litigation. *See, e.g., General Motors*, 80 F. Supp. 3d at 534 (finding no waiver where GM did not "offensively use[] the Valukas Report in litigation" or make "a selective or misleading presentation that is unfair to adversaries").

Here, the waiver should extend to all of the interview memoranda from RPM's Audit Committee investigation.  First, RPM knowingly allowed the disclosure to the SEC of the documents that effected the privilege waiver.  *See* RPM Opp'n at 13-14 (describing that RPM reviewed the documents and made whatever redactions it desired).  Second, all of the interview memoranda presumably concern the same subject matter:  RPM's conduct related to the DOJ investigation.  RPM does not claim otherwise.  Third, in fairness, all of the memoranda should be considered together.  *See Banneker Ventures*, 253 F. Supp. 3d at 74 (holding that waiver extended to all interview memoranda on which investigative report was based, but allowing redaction of subjects beyond report or lawyer mental impressions); *see also Symbol Techs.*, 2017 WL 1233842, at *18 (where party disclosed certain interview memoranda but withheld others on work product grounds, and the memoranda concerned same subject matter, "notions of fairness dictate[d] that [all the memoranda] should be considered together").

Alternatively, at a minimum, the waiver should reach the memoranda relating to all the witnesses for whom RPM disclosed communications from their interviews:  Edward Moore, Rusty Gordon, Ron Rice, Keith Smiley, and Frank Sullivan.  *See supra* section II.D.2.

## F.  Allowing RPM now to claw back the documents that effected a privilege waiver would be unfair to the SEC.

As a last-ditch argument, RPM asserts that, if the disclosures it knowingly allowed to the SEC waived privilege, then RPM should now be permitted "to claw the [EY] notes and memoranda back."  RPM Opp'n at 40.  That requested relief should be denied.

For example, in *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672 (D.C. Cir. 1979), a company disclosed documents to DOJ during an antitrust investigation.  *Id*. at 673.  After the documents had been "digested and analyzed by the Antitrust Division," and "[s]everal witnesses [had] been asked questions concerning the documents," *id*. at 674-75, the

company claimed that the documents were privileged and filed a motion seeking their return, *id.* at 673.  The D.C. Circuit affirmed the district court's denial of the motion because "it would be unfair and unrealistic now to permit the privilege's assertion as to these documents which have been thoroughly examined and used by the Government for several years."  *Id.* at 675.  As the D.C. Circuit explained, "[t]he Government attorneys' minds cannot be expunged," and "various witnesses' testimony regarding the papers has been heard," so "the disclosure cannot be cured simply by a return of the documents."  *Id.*  Instead, the "privilege has been permanently destroyed."  *Id.*; *see also Educ. Assistance Found. for the Descendants of Hungarian Immigrants in the Performing Arts, Inc. v. United States*, 32 F. Supp. 3d 35, 48 (D.D.C. 2014) (holding that fairness supported finding of waiver over allegedly privileged letter produced to IRS where "IRS has possessed and relied on the [letter]" for years and "its ongoing use of the document was well-known to all interested parties").

Here, too, fairness requires that RPM not be allowed at this late date to claw back the EY documents at issue.  The three EY documents highlighted in the SEC's motion to compel were produced to the SEC before it sued RPM in September 2016.  *See* RPM Opp'n at 2, 13 (stating that the EY documents were produced in October 2014).[9]  Further, RPM's counsel (i) reviewed the EY documents for privilege before they were produced to the SEC, (ii) were present at depositions (including Carlson's deposition) where the documents were used, and (iii) never sent a claw back letter seeking the return or destruction of the documents.  Under these circumstances, it would be unfair to the SEC to allow an eleventh-hour claw back since any "privilege has been permanently destroyed."  *In re Grand Jury Investigation*, 604 F.2d at 675.

---

[9]      As noted above, the SEC did not obtain Carlson's deposition testimony to explain the documents until December 2018.

The confidentiality of privileged communications "must be jealously guarded by the holder of the privilege lest it be waived." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (citation omitted); *see also Banneker Ventures*, 253 F. Supp. 3d at 71 (to avoid waiving privilege, a party "must 'zealously protect the privileged materials, taking all reasonable steps to protect their disclosure'") (citation omitted).  For the reasons set forth above, RPM did not zealously protect its privileged information, but rather allowed privileged communications to be disclosed to the SEC.  Permitting RPM to claw back the documents that effected its waiver *after* a judicial ruling that RPM waived privilege would be unfair to the SEC and would encourage carelessness in protecting privileged information, not the vigilance that the law requires.

## III.    CONCLUSION

Accordingly, the SEC respectfully requests that the Court review the interview memoranda *in camera*, redact any attorney mental impressions, and order that the redacted memoranda be produced to the SEC.

Dated:  July 31, 2019

Respectfully submitted,

/s/ Timothy K. Halloran
Gregory R. Bockin (DC Bar No. 450885)
Tel: 202-551-5684
E-mail: bocking@sec.gov
Timothy K. Halloran (DC Bar No. 483245)
Tel: 202-551-4414
E-mail: hallorant@sec.gov
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
*Counsel for the SEC*

## CERTIFICATE OF SERVICE

I certify that on July 31, 2019, a copy of the foregoing was filed through the Court's

CM/ECF system, which will send copies to all counsel of record.

/s/ Timothy K. Halloran
Timothy K. Halloran
*Counsel for the SEC*