```
                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


    Securities and Exchange        )
    Commission,                    ) Civil Action
                                   ) No. 16-CV-1803
                   Plaintiff,      )
                                   ) STATUS CONFERENCE
    vs.                            )
                                   ) Washington, DC
    RPM International, Inc., and   ) February 12, 2020
    Edward W. Moore,               ) Time:  10:00 a.m.
                                   )
                   Defendants.     )
_____

              TRANSCRIPT OF STATUS CONFERENCE
                      HELD BEFORE
          THE HONORABLE JUDGE AMY BERMAN JACKSON
              UNITED STATES DISTRICT JUDGE
_____

                     A P P E A R A N C E S

    For the Plaintiff:      Timothy Halloran
                            Thomas A. Bednar
                            U.S. Securities and Exchange Commission
                            100 F Street NE
                            Washington, DC  20549

    For the Defendant
      RPM International:    Mitchell Blair
                            Fritz Berckmueller
                            Calfee, Halter & Griswold
                            The Calfee Building
                            1405 East Sixth Street
                            Cleveland, Ohio  40114

                            William H. Wagener
                            Sullivan & Cromwell
                            125 Broad Street
                            New York, NY  10004
    For the Defendant
      Edward Moore:         Darren LaVerne
                            Kramer Levin Naftalis & Frankel LLP
                            1177 Avenue of the Americas
                            New York, NY, 10036-2714
```

```
                         Joseph Gonzalez
                         Schertler & Onorato, LLP
                         901 New York Avenue, N.W.
                         Suite 500 West
                         Washington, DC 20001


_____

Court Reporter:          Janice E. Dickman, RMR, CRR
                         Official Court Reporter
                         United States Courthouse, Room 6523
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         202-354-3267
```

```
 1                THE COURTROOM DEPUTY:  Your Honor, this is civil
 2    action number 16-1803, Securities and Exchange Commission
 3    versus RPM International, et al.
 4                Will counsel please approach the lectern, identify
 5    yourself for the record and name the party you represent.
 6                MR. HALLORAN:  I'm Tim Halloran for the SEC.  And
 7    with me is my colleague Tom Bednar.
 8                THE COURT:  Good morning.
 9                MR. BLAIR:  Good morning, Your Honor.  I'm Mitch
10    Blair from the Calfee firm in Cleveland for RPM.  With me at
11    counsel table are Bill Wagener, also for RPM, from Sullivan &
12    Cromwell, and my partner Fritz Berckmueller from my firm.
13                MR. LaVERNE:  Good morning, Your Honor.  I'm Darren
14    LaVerne for Mr. Moore.  With me at counsel table is Joseph
15    Gonzalez, with our local counsel, Schertler & Onorato.
16                THE COURT:  All right.  Good morning.
17                The parties in the Harling matter, I started this
18    case because everybody was here and ready to go.  This is going
19    to take probably about 15 minutes, maybe 20 minutes.  So I just
20    wanted to let you know, if you need to go get a drink of water
21    or have a conversation in the hallway, I'm going to finish with
22    this matter first, before I turn to you all.  And thank you for
23    your patience.
24                All right.  You called the case already.
25                We're here because plaintiff filed a motion to compel
```

1   the production in discovery of 19 interview memoranda prepared
2   by the law firm of Jones Day.  Jones Day isn't counsel to this
3   matter and conducted an independent investigation on behalf of
4   the audit committee for RPM.  The motion that I'm dealing with
5   is docket number 71.
6           I do want to apologize to the parties for how long it
7   took me to get to it.  It had nothing to do with the importance
8   of the issue or the quality of the papers.  It was a pipeline
9   issue.  But, I am prepared to rule on the motion this morning.
10          In 2011, RPM was the subject of an investigation by
11  the Department of Justice into possible violations of the False
12  Claims Act.  But it did not disclose the pendency of the
13  investigation or the related accrual in SEC filing until 2013.
14          Under audit standards an issuer must record an
15  accrual for a loss contingency if an unfavorable outcome is
16  determined to be probable and the amount of loss could be
17  reasonably estimated.  RPM's audit committee hired Jones Day to
18  investigate whether a potential loss from the DOJ investigation
19  was probable or estimable and, thus, should have been recorded
20  and disclosed.  And Jones Day conducted 19 witness interviews
21  as part of its investigation.
22          Whether they have to be produced as discovery in the
23  pending civil case was a matter that the parties had a dispute
24  about that I didn't think was resolvable by telephone and I
25  asked everyone to brief it.

1            RPM says the memoranda are attorney work product,
2    that 16 of them are also protected by the attorney-client
3    privilege, and that RPM didn't waive either privilege.
4            SEC disputes the applicability of the work product
5    doctrine at all, although it doesn't dispute that 16 of the 19
6    memoranda are covered by the attorney-client privilege.
7    However, notwithstanding the existence of the privileges or
8    not, the SEC argues that RPM waived any attorney-client
9    privilege and any work product protection, first of all, when
10   the contents of the witness interviews were disclosed to Ernst
11   & Young and then, through Ernst & Young and with RPM's
12   knowledge and consent, to the SEC, and also that RPM waived the
13   privilege by putting the findings of the audit committee at
14   issue in this litigation.
15           First, I want to talk about the attorney work product
16   privilege.  As every one of you knows, it applies to material
17   obtained or prepared by an adversary's counsel in the course of
18   his legal duties, provided that the work was done with an eye
19   towards litigation.  That's *In Re:  Sealed Case*, 676 F.2d 793
20   at 809, from the D.C. Circuit in 1982.
21           When considering whether a document is prepared in
22   anticipation of litigation, which is the test, the court
23   employs a "because of" test, inquiring, quote, whether in light
24   of the nature of the document and the factual situation in the
25   particular case the document can fairly be said to have been

1    prepared or obtained because of the prospect of litigation.
2           It's *FTC versus Boehringer Ingelheim Pharmacy, Inc.*,
3    778 F.3d 142 at 149, D.C. Circuit 2015, quoting *U.S. versus*
4    *Deloitte, LLP*, 610 F.3d 129 at 137, D.C. Circuit 2010.  Where a
5    document would have been created in substantially similar form,
6    regardless of the litigation, work product privilege is not
7    available.
8           Applying these precedents, I find that the interview
9    memoranda are not attorney work product because they were not
10   prepared in anticipation of litigation.
11          The record includes a memorandum dated August 13th,
12   2013, at docket 63-5, written by Ernst & Young, which says, on
13   page 2:  Ernst & Young discussed both the information that we
14   subsequently became aware of and the SEC investigation with
15   management and the RPM audit committee.  We recommended that an
16   independent investigation be performed into the company's
17   evaluation of information prior to the third quarter 2013 10Q
18   in making disclosure and accrual judgments with respect to the
19   GSA matter in previous periods.
20          The chair of RPM's audit committee, William Summers,
21   has testified in a deposition that Jones Day was hired to
22   conduct the investigation because of what I just said, Ernst &
23   Young suggested that they were not going to sign RPM's 10-K in
24   the absence of a special investigation.  That's Exhibit J to
25   defendant's opposition, docket 73-9 at page 165.  Summers

1         explained that RPM's, quote, assignment to Jones Day was to
2         conduct a thorough investigation based on the scope that Ernst
3         & Young felt was necessary to get them to a comfort level where
4         they would be able to sign the 10-K.  Clearly, we wanted to be
5         able to address EY's concerns.  That's the same deposition at
6         page 179 to 180.
7                 RPM repeats this in its opposition to the motion.  It
8         says Jones Day was hired because Ernst & Young indicated it
9         would not sign RPM's 10-K form without an independent
10        investigation.  Quote, The new E&Y lead audit partner stated
11        that she would not sign RPM's 2014 form 10-K unless the audit
12        committee conducted an independent investigation of the
13        accrual, close quote.  That's in defendant's opposition at
14        page 8.
15                RPM says, well, the investigation was conducted in
16        response to the SEC investigation and so it was in anticipation
17        of litigation.  And as support for that it points out that the
18        investigation was initiated in July 2014, immediately following
19        a discussion about the active formal SEC enforcement
20        investigation.  And it points to Exhibit I to the Wagener
21        declaration, docket 73-3, which summarizes that after an
22        executive session regarding the investigation, the committee
23        decided to retain Jones Day.
24                And Jones Day's declaration states that it
25        subjectively thought that litigation could occur.  And RPM

1    contends that this belief was objectionably reasonable.  That's
2    Sozio declaration, docket 73-22 at paragraph 4.
3            But, the notion of the "because of" factor, why the
4    investigation was undertaken, the notion that it was in
5    anticipation of litigation is not consistent with the written
6    record, which clearly shows that Jones Day was hired for a
7    different specific purpose.  The minutes of the RPM audit
8    committee meeting from July 21st, 2014, the date the committee
9    decided to hire Jones Day, states that RPM had been notified on
10   June 24th that it was the subject of a formal investigation.
11           The committee talked about the potential impact on
12   its financial statement.  The minutes then state, quote, The
13   committee determined to retain the law firm Jones Day to
14   conduct an independent investigation into the timing of the
15   disclosure and accruals in question.  Pending resolution of
16   this audit committee investigation, the company intends to file
17   a notification of late filing on form 12b-25 with respect to
18   its annual report on form 10-K by July 31st, 2014, which will
19   include a substantial portion of the disclosures required other
20   than the financial statements.  That's docket 60-1 at page 5.
21           August 12th, 2014, the special board of directors has
22   a meeting in which it discusses the investigation and it says
23   that Jones Day made recommendations regarding potential
24   amendments to the form 10Qs for the first, second, and third
25   quarters of 2013.  In the Ernst & Young memorandum that I

1   mentioned earlier, the August 13, 2013 document, docket 63-5,
2   the accountant points out that Calfee is the company's regular
3   SEC counsel and he is advising the company on the SEC
4   investigation.
5           Jones Day is not RPM's SEC reporting counsel, nor has
6   it provided any legal advice with respect to SEC reporting
7   matters or the matters subject to this investigation.
8           An August 14, 2014 letter from RPM to Ernst & Young
9   says, On July 22, 2014 the audit committee, on behalf of the
10  company, engaged Jones Day to conduct an investigation
11  pertaining to the timing of the company's disclosures and
12  accrual of loss reserves with respect to the GSA and DOJ
13  investigation into compliance issues.  The audit committee
14  confirmed that as a result of this investigation, it was not
15  aware of any intention of the company to violate the law.  It
16  goes on to say that the company remains subject to a formal SEC
17  investigation.  But then it says as a result of this
18  investigation -- meaning the Jones Day investigation -- the
19  company has restated quarterly results and continues to
20  cooperate with the SEC in its investigation.  The outcome of
21  the SEC investigation is unknown.
22          So basically the work was done by Jones Day and then
23  Ernst & Young did what it was supposed to do based on the
24  information it received.
25          The documents and Jones Day's interactions with Ernst

1    & Young and the audit committee all show that Jones Day was
2    hired to investigate the timing of the disclosures and accruals
3    in question to determine whether RPM needed to restate its
4    financials.
5             Furthermore, and this talks about work product, the
6    memoranda do not meet the test because they are completely
7    devoid of legal opinions, thoughts or mental impressions.  They
8    contain no analysis whatsoever.  There is no assessment of the
9    witness's demeanor or credibility; no identification of
10   instances in which they may be consistent or inconsistent with
11   information received from other witnesses or with key
12   documents.  The memoranda simply recount facts or set forth
13   what the witnesses said, remembered, or indicated.
14            And, you know, if this were a criminal case there
15   would be issues about reverse *Jencks* with these memos, and it
16   is very hard to say that they could possibly be covered by the
17   work product privilege.  They don't begin to implicate the
18   concerns about insulating an attorney's litigation preparation
19   from discovery that underlie the work product privilege.  Thus,
20   these aren't the litigators anyway.
21            But even if one were to conclude that the memoranda
22   were work product, that privilege was waived when RPM
23   authorized Ernst & Young to share the substance of the
24   interviews with the SEC.  The SEC conducted a review of the
25   documents that were -- I'm sorry, RPM permitted these documents

1   to be transferred from Ernst & Young to the SEC, and contents
2   of various memoranda which recounted the results of the audit
3   committees' investigation and the contents of witness
4   interviews were produced to the SEC.  And that's inconsistent
5   with the notion that we need to maintain secrecy from our
6   adversary.
7           RPM says, well, only the facts derived from the
8   interviews were disclosed and not the actual work product
9   themselves.  But that's where the point I just made plays a
10  role.  There's nothing else in the memos, other than a
11  recitation of the factual statements.  There is no analysis, no
12  mental impression that the work product privilege would
13  otherwise protect.  Therefore, I find that the 19 interview
14  memoranda are not covered by the attorney work product
15  doctrine.
16          This leaves the attorney-client privilege.  The SEC
17  does not contest that the attorney-client privilege applies to
18  16 of 19 of the memos.  Thus, the only question to be
19  determined is whether the defendant waived the privilege.  And
20  as the case law you all provided indicates, it's a different
21  standard for waiver of the attorney-client privilege and waiver
22  of the work product privilege.  An attorney-client privilege is
23  basically once you open the door and you give it to someone,
24  it's no longer covered by the privilege.  The privilege
25  protects communications between a client or person who seeks to

1   become a client and an attorney made for the purpose of
2   securing an opinion on the law, legal services, or assistance
3   in a legal proceeding.  That's *In re: Sealed Case* again, 737
4   F.2d 94, at 98 to 99.
5           It's well established that the privilege applies to
6   communications between corporate counsel and a corporation's
7   employees made at the direction of corporate superiors in order
8   to secure legal advice from counsel.  That's the *Upjohn*
9   opinion, 449 U.S. 383.
10          The privilege protects the attorney-client
11  relationship by safeguarding confidential communications.
12  Thus, voluntary disclosure waives the attorney-client privilege
13  because it's inconsistent with the confidential relationship.
14  That's the *U.S. versus Deloitte* case again, 610 F.3d 129 at 139
15  to -40, citing *United States versus AT&T*, 642 F.2d 1285 at
16  1299.  The D.C. Circuit has stated if a client wishes to
17  preserve the privilege it must treat the confidentiality of
18  attorney-client communications like jewels, if not crown
19  jewels.  That's *In re: Sealed Case*, 877 F.2d 976, it's 980.
20          Any voluntary disclosure by the client to a
21  third-party breaches the confidentiality and therefore waives
22  the privilege, not only as to the specific communication
23  disclosed, but often as to all other communications relating to
24  the same subject matter.  *In re: Sealed Case*, 676 F.2d at 809.
25  Courts have held that where the substance of investigative

interviews are disclosed, that will waive the attorney-client privilege because it's inconsistent with the confidential relationship. There's a district court opinion, *In re: En Banc of California Security Litigation*, 2018 WL 2373860, agreeing that disclosure to the SEC of summaries of the witness interviews acted to waive any work product or attorney-client privilege over any notes or memorandum memorializing those interviews.

Similarly, the Southern District of New York in *SEC versus Vitesse Semiconductor Cooperation*, 2011 Westlaw 2899082, the company waived the work product privilege with respect to notes from witness interviews. Well, that's the work product privilege, which I've already said we don't have work product here. There's also *United States versus Reyes*, R-E-Y-E-S, 239 F.R.D. 591 from the Northern District of California, where the parties waived both the attorney-client privilege and the work product privilege when they disclosed the substance of their investigative interviews to the government.

So I find that the attorney-client privilege here was waived when RPM disclosed the contents of the interviews to Ernst & Young, which also, thereafter, were disclosed to the SEC.

Mark Carlson, the engagement Partner at Ernst & Young, testified that RPM communicated with him on a regular basis and he was updated on the status of the investigation and

1   on what the witnesses said during their interviews.  That was
2   his deposition, docket 71-7, at pages 19 to 20.  He then
3   memorialized what he was told by RPM in memoranda that were
4   produced the to SEC after RPM conducted a privilege review of
5   the documents.
6          These amendments make it clear that the attorney-
7   client privilege was waived since Carlson was fully aware of
8   the contents of the witness interviews.  His August 10, 2014
9   memorandum, docket 71-9, he notes that Ernst & Young and Jones
10  Day participated in a phone call in which Jones Day reported
11  the preliminary findings and conclusions of the audit
12  committee.  The memo memorialized what was discussed,
13  including -- and I'm not going to go through all the facts, but
14  it specifically quotes things that Ed Moore said, things that
15  Rusty Gordon said, things that Keith Smiley said, and Sullivan
16  said.
17         Then there's another memorandum, docket 71-10,
18  written August 13, 2014 that talks about what the company
19  decided to do, the best estimates available of what the loss
20  would be, what Ed Moore said, what he said to Gordon, Smiley,
21  and Sullivan, what Ed Moore didn't say, and then specific
22  content of the interview.  In the memo it says, quote, In his
23  interview Ed Moore took responsibility for his failure to
24  communicate updated information.  It says what Moore said.
25  Then it says:  In their interview Sullivan and Gordon indicated

1    that they, quote, were not aware that RPM's potential liability
2    had increased significantly.  Sullivan indicated he was, quote,
3    surprised.  Gordon, quote, stated that he relied on Ed Moore.
4            We also have docket 71-11, Carlson's handwritten
5    notes.  He took notes of the interview that Jones Day provided
6    to him, telling him what they learned when they interviewed the
7    employees about what happened.  Specifically has notes about
8    what Moore said during Moore's interview with Jones Day, quote,
9    Moore should have got RPM finance people involved.  Moore heard
10   RPM's exposure was going up on December 21st.  Moore said he
11   would never do it again without an RPM finance person involved.
12           Defendant wants to argue that Jones Day's
13   communications with Ernst & Young regarding the interviews
14   didn't waive the privilege because Jones Day didn't disclose
15   privileged communications, it only disclosed facts.  But RPM
16   didn't just disclose facts, it disclosed the specific
17   statements made during the interviews, and it covers the entire
18   subject matter of those interviews.
19           So, I find that there is no attorney work product
20   privilege; to the extent there is, it was waived.  That the
21   attorney-client privilege exists with respect to the 16
22   memoranda, but it was waived.
23           In the last sentence of its opinion RPM sort of
24   throws out there, with no legal authority, well, let us claw
25   Carlson's notes and memoranda back from the SEC.  The problem

1   with that is that the waiver of the privilege occurred when RPM
2   disclosed the contents of the interview memoranda to Ernst &
3   Young, not when it permitted Ernst & Young to produce Carlson's
4   notes and memoranda to the SEC.  The door is already open at
5   that point and then they just opened it a little wider.  So a
6   claw back wouldn't restore the privilege and really wasn't
7   provided with any substantial legal grounds for finding that it
8   does anyway.
9              So, therefore, SEC's motion to compel will be granted
10  and RPM must produce the unredacted interview memoranda.
11             I believe that is the only thing that has been
12  holding up the conclusion of discovery in this case.  So, I
13  think what I would like to do is let the production take place,
14  let the parties assess them, see where we are, if anything
15  further needs to be done.  And you can file a status report two
16  weeks from today.  Which would be when, Mr. Haley?
17             THE COURTROOM DEPUTY:  February 26, Your Honor.
18             THE COURT:  All right.  On February 26 file a joint
19  status report and let me know if discovery is now closed and
20  propose a schedule for further proceedings after that, or where
21  we are in this matter.
22             I think once discovery closes, the parties can think
23  about, before they provide me with a briefing schedule for
24  their dueling motions for summary judgment, whether this is a
25  case that would be amenable to resolution through mediation.

1    We have a very good court mediator in this building and also,
2    obviously, very competent and experienced magistrate judges who
3    are, I think, a lot more backed up and harder to get to in a
4    reasonable period of time.  But, if that's something that you
5    all would consider prior to trying to tell me that this case
6    should be resolved as a matter of law, you can put that in your
7    memorandum as well.
8            All right.  Is there anything further I need to take
9    up on behalf of the SEC right now?
10           MR. HALLORAN:  No, Your Honor.
11           THE COURT:  Okay.  Anything further on behalf of RPM?
12           MR. BLAIR:  Very quickly, Your Honor.  Obviously our
13   client needs to assess the impact of your ruling and figure out
14   if there are additional steps they need to take to protect the
15   record.
16           THE COURT:  All right.
17           MR. BLAIR:  So we appreciate the two-week time period
18   to do that, and we expect to have decided what action to take
19   by that time.
20           THE COURT:  All right. And if at that time you
21   haven't and you need more time, just tell me you need more
22   time.  I realize this decision has been a long time coming.
23           MR. BLAIR:  Thank you, Your Honor.
24           THE COURT:  But I don't -- I don't feel that it was a
25   particularly close call once I looked at all the underlying

```
1    documents and I read the memoranda themselves.
2              MR. BLAIR:  Understood.
3              THE COURT:  All right.  Thank you.
4              MR. LaVERNE:  Thank you.
5              THE COURT:  Thank you.
6                          *   *   *
```

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 12th day of February, 2020

/s/_____

Janice E. Dickman, CRR, RMR
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001